974 A.2d 1057

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v.
JAMES ROBINSON, DEFENDANT–RESPONDENT.

Argued April 28, 2009—Decided July 22, 2009.

*Deborah C. Bartolomey,* Deputy Attorney General, argued the cause for appellant (*Anne Milgram,* Attorney General of New Jersey, attorney).

*Kevin G. Byrnes,* Designated Counsel, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney).

Justice RIVERA–SOTO delivered the opinion of the Court.

The warrant requirement embodied in both the Fourth Amendment to the United States Constitution, *U.S. Const.* amend. IV, and in paragraph 7 of Article 1 of the New Jersey Constitution, *N.J. Const.* art. I, ¶ 7, limits the power of the sovereign to enter our homes and seize our persons or our effects. A pre-existing common law requirement has been grafted onto that constitutional

4

proscription: that, subject to limited exceptions, law enforcement must first knock and announce its purpose before it lawfully may enter a dwelling to execute a warrant.

In this appeal, we return once more to those bedrock principles. In doing so, we reaffirm that, when law enforcement seeking to serve a warrant has announced its presence and is confronted by silence, a reasonable period of time must elapse between the announcement made and any subsequent forcible entry into the dwelling. We further reaffirm that the determination of what is a reasonable period of time is not driven solely by the length of time elapsed, but instead requires the application of relevant factors in a fact-sensitive analysis.

## I.

On January 9, 2004, Investigator Robert Ferris of the Camden County Prosecutor's Office and Detective Jack Welker of the Pine Hill Police Department jointly applied for a search warrant. In the affidavit in support of the warrant, Inv. Ferris and Det. Welker, after setting forth their individual educational and experiential backgrounds in law enforcement, recounted at length the facts of an undercover investigation into cocaine sales by Diane Winter and defendant James Robinson. Through the use of confidential informants, that investigation disclosed that telephone and in-person orders for cocaine were being placed to Winter, and the cocaine could be paid for and picked up at Winter's home. The investigation also disclosed that, if Winter did not have the cocaine needed to satisfy an order in hand, she would contact defendant, who would bring the ordered amount of cocaine to Winter's home. Finally, the investigation disclosed that cocaine also could be purchased directly from defendant at his apartment.

Specifically, on December 10, 2003, Inv. Ferris, acting undercover, and a confidential informant went to Winter's home, where the informant introduced Inv. Ferris to Winter. Once Winter admitted Inv. Ferris and the informant into her home, Inv. Ferris asked for three bags of cocaine. Winter explained that she did not have

any cocaine in hand and, thus, would call defendant. Winter did so and explained to Inv. Ferris that defendant "would be over." Within the hour, defendant appeared at Winter's home and asked Inv. Ferris what he needed. Responding to Inv. Ferris's request, defendant produced three bags of cocaine. After inspecting the bags, Inv. Ferris paid defendant for the drugs and, together with the confidential informant, left. Three weeks later, Det. Welker, using a different confidential informant, conducted another controlled buy of cocaine. This time, the informant, acting alone but under strict police supervision, purchased cocaine directly from defendant at defendant's own apartment.

Armed with this information, on January 9, 2004, Inv. Ferris and Det. Welker made application to the Superior Court for a search warrant for defendant's apartment. Their joint affidavit included a detailed description of the two earlier illegal drug transactions. Later that same day and based on the sworn factual representations made in the application, the court issued the requested search warrant. The warrant specified that the place to be searched was defendant's apartment and that the property to be seized included

> controlled dangerous substance[s] in pill, powder, crystal, liquid or vegetation form, and all objects/things used in connection with said substances, such as scales, papers, wrappings, bags, strainers, cutters, blades, ledgers, monies, and other items, documents, electronic devices including but not limited to digital pagers, cellular phones, answering machine tapes, computers, or things that may constitute evidence relating to [the possession and sale of drugs].

It commanded that the police, "in the name of the State of New Jersey, with the necessary and proper assistance . . . enter and search [defendant's apartment] for the property specified and all persons present therein reasonably believed to be connected with said property and investigation[,]" and that the search was to be executed between the hours of 5:00 a.m. and midnight. The warrant further authorized the seizure of "all such specified property which may be found on the premises." It also ordered that it was to be executed within ten days and that a return on the warrant, including an inventory of the items seized, was to be made "forthwith." Finally, the warrant specifically disapproved

its execution without law enforcement first knocking and announcing its presence and purpose.

On January 16, 2004, at approximately 6:30 a.m., and after a discussion and briefing, thirteen police officers, including members of the Berlin Township Police Department's Zone 4 Tactical Team, converged on defendant's apartment to execute the warrant. The officers knocked and announced their purpose; no response was received. After a twenty- to thirty-second interval, the police officers forcibly gained entry and seized drugs, cash, a paper ledger and a scale. Defendant, who was present, was arrested.

Based on the foregoing, the Camden County Grand Jury returned a four-count indictment against defendant. Counts One and Two of the indictment, which related to the December 10, 2003 drug transaction consummated at Winter's home, charged defendant with third-degree distribution of cocaine, in violation of *N.J.S.A.* 2C:35–5(b)(3), and second-degree distribution of cocaine within 500 feet of the real property comprising a public housing facility, a public park, or a public building, in violation of *N.J.S.A.* 2C:35–7.1(a). Counts Three and Four of the indictment, which were based on the drugs seized when the search warrant was executed on defendant's apartment on January 16, 2004, charged defendant with third-degree possession of cocaine, in violation of *N.J.S.A.* 2C:35–10(a)(1), and third-degree possession of cocaine with the intent to distribute, in violation of *N.J.S.A.* 2C:35–5(b)(3). No charges were brought in respect of the January 2004 confidential informant/controlled purchase of drugs from defendant at his apartment.

Defendant moved to suppress the fruits of the search.[1] On the return date of that motion, he advanced two discrete claims.

---

[1] *See R.* 3:5–7(a) (providing that "a person claiming to be aggrieved by an unlawful search and seizure and having reasonable grounds to believe that the evidence obtained may be used against him or her in a penal proceeding, may apply to the Superior Court only and in the county in which the matter is pending or threatened to suppress the evidence and for the return of the property seized").

First, defendant asserted that there was insufficient probable cause to support the issuance of the search warrant because some of the statements contained in the affidavit in support of the warrant allegedly were false. Addressing that assertion, the trial court noted that there were two separate drug transactions described in the affidavit in support of the search warrant, one of which occurred in the presence and with the participation of an undercover police officer and the other having occurred under the strict supervision of the police. It observed in general that, under *Franks v. Delaware*, 438 *U.S.* 154, 98 *S.Ct.* 2674, 57 *L.Ed.*2d 667 (1978), and *State v. Howery*, 80 *N.J.* 563, 404 *A.*2d 632 (1979), a defendant challenging the veracity of the allegations contained in an affidavit in support of a warrant bears the burden to "make[ ] a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit[.]" *Franks, supra,* 438 *U.S.* at 155–56, 98 *S.Ct.* at 2676, 57 *L.Ed.*2d at 672. It underscored *Franks*'s command that "if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Id.* at 156, 98 *S.Ct.* at 2676, 57 *L.Ed.*2d at 672; *see also Howery, supra,* 80 *N.J.* at 568, 404 *A.*2d 632 (holding that "New Jersey courts, in entertaining veracity challenges, need go no further than is required as a matter of Federal Constitutional law by *Franks v. Delaware, supra*"). The trial court determined that because "defendant has supplied nothing that challenges the validity of the affidavit . . . he has not made the required substantial preliminary showings, [he is] not entitled to a *Franks* [h]earing[,] and [he] may not challenge the warrant at this point."

Because the search had been conducted pursuant to a warrant, the trial court was guided by the principles applicable to challenges of searches performed pursuant to a validly issued warrant:

A search based upon a warrant is presumed to be valid once the State establishes that the search warrant was issued in accordance with the procedures prescribed by the rules governing search warrants. The burden of demonstrating the invalidity of such a search is placed upon the defendant. The defendant must

establish that there was no probable cause supporting the issuance of the warrant or that the search was otherwise unreasonable.

[*State v. Valencia*, 93 *N.J.* 126, 133, 459 *A.2d* 1149 (1983) (citation omitted).]

After canvassing the contents of the affidavit in support of the warrant, the trial court concluded that "[i]t's clear ... that there was probable cause to believe that a controlled dangerous substance was being sold from [defendant's] apartment[ ] and, therefore, the issuance of a warrant was proper."

Defendant's second claim in support of his motion to suppress was that the police had failed to knock and announce their presence when executing the search warrant. In opposition, the State offered a single witness, Detective Sergeant Leonard Check of the Berlin Township Police Department. He explained that it was his "duty ... to make a knock and announce at the residence because it was a knock and announce warrant." He made clear that it was he who "knocked and announced on the apartment door prior to entry." Det. Sgt. Check testified as follows concerning the procedure employed in the execution of the warrant:

Q. Okay. And when you knocked and announced your presence, what exactly did you say?

A. Police department; search warrant.

Q. Did anybody answer the door at that point?

A. No.

Q. Okay. And what did you do after no one answered the door?

A. We waited approximately 20, 30 seconds. The door was forcibly breached, and then we deployed a percussion grenade inside the door.... We deployed a distraction device inside the doorway.

Q. And what distraction device was that?

A. The distraction device, it emits smoke and also a loud bang and a loud flash.

Q. Okay. And what's it called?

A. It's a distraction device or also known as a flash bang.

Det. Sgt. Check explained that a "flash bang" is a device "you release ... right inside the doorway maybe one or two feet inside the doorway." He noted that "in approximately two seconds it goes off and emits a loud flash, loud bang, and smoke." He described its purpose as giving "the members of the team a

surprise to the occupants of the dwelling so we can get in safely, get through the doorway safely and secure everyone in there."

That explanation triggered the following exchange:

Q. Now[,] you testified that you've executed over a hundred search warrants. Is a flash bang always used when executing search warrants?

A. No, it's not primarily used.

Q. Why was it used in this case?

A. At the briefing we had information that the occupant of the dwelling's nephew sometimes stays with him and he operates a blue Crown Victoria with tinted windows.

Defendant's counsel objected, interrupting that explanation. Because defendant's sole remaining challenge focused exclusively on whether the officers had knocked and announced before forcibly entering defendant's apartment, the trial court stated: "Okay. This is beyond the point of anything. I'll sustain the objection."

Although defense counsel had objected to Det. Sgt. Check's direct testimony concerning the use of a "flash bang" device, he nevertheless returned to that topic in his cross-examination of Det. Sgt. Check:

Q. Okay. And you testified earlier that you first knocked, right?

A. Yes, sir.

Q. And you also testified that the reason for that device is to give—so the team can surprise someone. Is that correct?

A. Correct.

Q. How do you surprise them when—if you already knocked?

A. That's why we use it; because we do knock. They know we're there, so we try to give a little bit more of a shock and surprise to make the team make entry after the knock.

Det. Sgt. Check was excused, the parties rested, and the trial court entered its findings. It noted that it had "had the opportunity to hear the testimony of the witness, observe his demeanor, [and] determine his credibility." It found Det. Sgt. Check "to be credible." It further found as a fact "that in executing the warrant the officers did knock" and that "[t]here was no answer and then a forced entry was necessary." Based on those findings, it denied defendant's motion to suppress.

Defendant was tried before a jury, and he was convicted on all counts. The trial court granted the State's motion to impose a mandatory extended term, pursuant to *N.J.S.A.* 2C:43–6(f), and sentenced defendant to an aggregate term of imprisonment of fifteen years, with a five-year period of parole ineligibility. That sentence was to run consecutively to another sentence of three years' imprisonment, with an eighteen-month period of parole ineligibility, defendant already was serving on different charges; appropriate fees, penalties and assessments also were imposed.

Defendant appealed. His challenge to the trial court's denial of his suppression motion was two-fold. First, defendant claimed that the warrant was not supported by probable cause. Second, and for the first time, he argued that, even if the warrant was validly issued, the manner of execution of the warrant-by the use of a "flash bang" device-was unreasonable.[2] In a published opinion, the Appellate Division "[a]s a threshold issue ... reject[ed] defendant's argument that the warrant was not supported by probable cause." *State v. Robinson*, 399 *N.J.Super.* 400, 409, 944 *A.*2d 718 (App.Div.2008). It concluded that "[t]he joint affidavit presented by the State in support of the application for the

---

[2] Before the Appellate Division, defendant also challenged several points he designated as not raised before the trial court. Defendant identified them as: allegedly improper jury charges; the admission of evidence concerning defendant's invocation of his right to remain silent; the claim that "anonymous, absentee accusers had implicated ... defendant in drug law violations[;]" and the claimed failure to prove, in respect of Count Two of the indictment that charged a drug transaction within five hundred feet of a park, that the park in proximity to the December 10, 2003 drug purchase "was a municipal, county, state, federal, or private park." *See R.* 2:6–2(a)(1) (requiring that appellant's brief contain table of contents and stating that "[i]t is mandatory that any point not presented below be so indicated by including in parenthesis a statement to that effect in the point heading"). Defendant also identified three issues he claimed in fact had been raised before the trial court: that his motion to suppress should have been granted as a general matter (without specifically addressing defendant's tardy objection to the use of a "flash bang" device); that the State had failed to prove that defendant knowingly and voluntarily waived his rights under *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966); and that his sentence was excessive.

issuance of the warrant provides sufficient, detailed information to establish that defendant's residence was being used for distributing cocaine." *Id.* at 409–10, 944 *A*.2d 718.

The panel then turned to defendant's assault on the reasonableness of the manner of execution of the warrant. Concentrating on "the execution phase of the search warrant as that may impact on the reasonableness of the search itself[,]" *id.* at 410, 944 *A*.2d 718, the panel asserted that "the officers arrived at defendant's residence at 6:30 a.m. [and that] they knocked on the door, announced their presence and purpose, then, after waiting for just *twenty or thirty seconds*, they 'forcibly breached' the door, and deployed a 'percussion grenade' inside." *Id.* at 413, 944 *A*.2d 718 (emphasis in original). It then reasoned that

> [t]here is no justification in the record before us for such extreme measures. Given that it was 6:30 a.m., it is entirely reasonable to expect that it might take a person more than thirty seconds to wake up, put on an item of clothing, and walk an unknown distance to answer the door. Under these circumstances, waiting just twenty to thirty seconds before forcibly breaking down the door of a residence renders the search facially unreasonable, and practically nullifies the knock-and-announce condition specifically imposed by the court.
>
> [*Ibid.*]

Commingling defendant's newly raised objection to the use of a "flash bang" device with his earlier assertion that the officers had failed to comply with the knock-and-announce rule, the panel concluded:

> All of the evidence thus leads to one conclusion: the officers gave the knock-and-announce requirement in the warrant only perfunctory consideration. The decision to gain entry by force had been reached long before the officers arrived at defendant's residence. Under these circumstances, the judicial restriction was rendered a nullity, converting the police's actions into a warrantless invasion of defendant's dwelling, requiring the suppression of any evidence gathered therefrom.
>
> [*Id.* at 413–14, 944 *A*.2d 718.]

The Appellate Division then undertook an argument defendant never advanced before the trial court. According to defendant's Appellate Division brief, "[e]ven if the warrant was valid, the police used an unreasonable method of entry: the detonation of bombs." In a more moderate tone, the panel stated that "[t]he

use of the 'percussion grenade' or 'flash bang' device here presents an independent, and arguably more significant basis for invalidating the search." *Id.* at 415, 944 *A.2d* 718. Finding "a rational nexus between the use of a flash bang device, and an entry by force, whether expressly authorized by a no-knock warrant, or otherwise required by exigent circumstances[,]" it reasoned that "the use of a flash bang device is antithetical to and irreconcilable with the public policy grounds supporting a knock-and-announce warrant." *Id.* at 416–17, 944 *A.2d* 718. It thus held that

> absent unforeseen exigent circumstances supporting the use of force, the use of a flash bang device in connection with the execution of a "knock-and-announce" warrant, nullifies the legal efficacy of such warrant, rendering the entry and search of the dwelling unconstitutional, in violation of a defendant's rights under Article I, paragraph 7 of the Constitution of the State of New Jersey.
>
> [*Id.* at 417, 944 *A.2d* 718.]

The State sought certification of the Appellate Division's judgment, asserting that the manner of execution of the search warrant was reasonable.[3] We granted the State's petition for certification, 197 *N.J.* 259, 962 *A.2d* 530 (2008), and, for the reasons that

---

[3] After the Appellate Division rendered its decision, the State sought reconsideration. It argued that, because the suppression order would have applied only to the evidence seized at defendant's apartment, which was separately charged in Counts Three and Four of the indictment, the convictions on Counts One and Two of the indictment relating to the earlier sale of drugs in Winter's home should have remained unaffected. In an unpublished decision, the Appellate Division rejected that construct, concluding that "the evidence supporting [Counts Three and Four of the indictment relating to defendant's possession of cocaine at the time the search warrant was executed] cannot be considered in isolation from the overall case presented by the State at trial." Although the Appellate Division ruled on the State's motion for reconsideration before the State filed its petition for certification before this Court and although the State set forth in its notice of petition, *see R.* 2:12–3(a), that it was appealing from both the judgment of the Appellate Division reversing and remanding for a new trial and the denial of reconsideration, the State did not raise that latter question in its principal petition for certification; the question was not presented until the State filed a supplemental brief and appendix some four months after certification had been granted. That said, in light of our disposition of the remainder of this appeal, we need not address the substantive question belatedly raised by the State.

follow, we reverse the judgment of the Appellate Division and reinstate defendant's convictions and sentence.

## II.

The State challenges the Appellate Division's decision in several respects. First, it argues that the execution of the search was reasonable under the circumstances. Second, it suggests that the Appellate Division's reasoning and conclusions concerning the use of a "flash bang" device must be rejected because there is no factual record upon which to base the panel's analysis and, more importantly, defendant waived that issue by not preserving it before the trial court. Next, the State also asserts that, even if one were to reach the legal propriety of the use of a "flash bang" device, its use in these circumstances was reasonable. Finally, invoking *Hudson v. Michigan*, 547 *U.S.* 586, 126 *S.Ct.* 2159, 165 *L. Ed.*2d 56 (2006), the State urges that this Court hold that suppression of evidence is not the proper remedy when the only infirmity asserted is the claimed unreasonable execution of an otherwise valid warrant.

Relying on his submissions to the Appellate Division, defendant equates a "flash bang" device with a bomb and thus asserts that "[t]here is nothing reasonable about detonating bombs to seize a couple of grams of CDS." He argues that "[t]he manner of entry was particularly egregious because the magistrate in this case did not even authorize a no-knock entry." He urges that "courts need to put an end to this process, or at least control it[,]" stating that "[a]t minimum, there must be strict guidelines, including application for the use of explosives at the time of the search warrant application."

## III.

### A.

The knock-and-announce rule renders unlawful a forcible entry to arrest or search "where the officer failed first to state his

authority and purpose for demanding admission." *Miller v. United States,* 357 *U.S.* 301, 308, 78 *S.Ct.* 1190, 1195, 2 *L.Ed.*2d 1332, 1337 (1958). The rule is firmly embedded in our common law heritage:

> The requirement that law enforcement officers knock and announce their presence before entering a dwelling predates our federal and State Constitutions. As a long-standing component of the common law, the "knock-and-announce" rule reflects "the ancient adage that a man's house is his castle." *Miller v. United States,* 357 *U.S.* 301, 307, 78 *S.Ct.* 1190, 1194, 2 *L.Ed.*2d 1332, 1337 (1958). The rule was pronounced about 400 years ago in *Semayne's Case,* 79 *Eng. Rep.* 194 (K.B. 1603), although some commentators trace its legal origin to an earlier period in the thirteenth century, around the time of the Magna Carta. *Wilson v. Arkansas,* 514 *U.S.* 927, 932 n. 2, 115 *S.Ct.* 1914, 1917 n. 2, 131 *L.Ed.*2d 976, 981 n. 2 (1995). [*State v. Johnson,* 168 *N.J.* 608, 615, 775 *A.*2d 1273 (2001).]

■ Originally tethered to the execution of arrest warrants, the knock-and-announce rule derived from our common law has evolved to apply to the execution of all warrants: "peace officers may break into a dwelling house for the purpose of making an arrest [or executing a search warrant] only after demanding admittance and explaining their purpose." *State v. Fair,* 45 *N.J.* 77, 86, 211 *A.*2d 359 (1965) (citation omitted). Although an integral part of the mosaic of procedural mechanisms designed to shield and protect individual rights, "the requirement that law enforcement officers first knock and announce their presence before entering a dwelling is not absolute." *Johnson, supra,* 168 *N.J.* at 616, 775 *A.*2d 1273. Exceptions have been allowed where "(1) immediate action is required to preserve evidence; (2) the officer's peril would be increased; or (3) the arrest [or seizure] would be frustrated." *Fair, supra,* 45 *N.J.* at 86, 211 *A.*2d 359 (citations omitted). Also, in its application, the knock-and-announce rule is not particularly onerous. *See Miller, supra,* 357 *U.S.* at 309, 78 *S.Ct.* at 1196, 2 *L.Ed.*2d at 1338 ("The rule seems to require notice in the form of an express announcement by the officers of their purpose for demanding admission. The burden of making an express announcement is certainly slight.").

It is against that yardstick that the challenged police actions must be measured.

## B.

We start on familiar ground, recognizing that our scope of review is limited. "[A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." *State v. Elders*, 192 *N.J.* 224, 243, 927 *A.*2d 1250 (2007) (citation and internal quotation marks omitted); *see also State v. Nyhammer*, 197 *N.J.* 383, 409, 963 *A.*2d 316 (2009) (explaining that appellate courts "must defer to the factual findings made by the trial court"). Also, "[a]n appellate court should give deference to those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." *Elders, supra*, 192 *N.J.* at 244, 927 *A.*2d 1250 (citation and internal quotation marks omitted). Further, "[a]n appellate court should not disturb the trial court's findings merely because it might have reached a different conclusion were it the trial tribunal or because the trial court decided all evidence or inference conflicts in favor of one side in a close case." *Ibid.* (citation and internal quotation marks omitted). The governing principle, then, is that "[a] trial court's findings should be disturbed only if they are so clearly mistaken that the interests of justice demand intervention and correction." *Ibid.* (citation and internal quotation marks omitted). It is only in those latter circumstances that an appellate court should " 'appraise the record as if it were deciding the matter at inception and make its own findings and conclusions.' " *Ibid.* (quoting *State v. Johnson*, 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964)). The overall precept is stated simply: "on appeal we may only consider whether the motion to suppress was properly decided based on the evidence presented at that time." *State v. Gibson*, 318 *N.J.Super.* 1, 9, 722 *A.*2d 960 (App.Div.1999).

Those deferential principles yield the following. The trial court found as a fact that Det. Sgt. Check knocked on defendant's door; that Det. Sgt. Check announced that it was the police and

that they had a search warrant; that the police officers waited between twenty and thirty seconds; and that there was no answer. The trial court further found that it was only then that a "forced entry was necessary." Based on those findings, and confronted with defendant's failure to raise the reasonableness of the manner of entry during the motion to suppress proceedings, the trial court denied defendant's suppression motion. Those factual findings and legal conclusion clearly are supported by sufficient credible evidence in the record and, hence, are unassailable.

A necessary corollary to the knock-and-announce rule is that when "the police announce[ ] their presence and [are] greeted with silence ... a reasonable time must elapse between the announcement and the officers' forced entry." *Johnson, supra,* 168 *N.J.* at 621, 775 *A.*2d 1273. That corollary presents a quandary, for "[w]hen the knock-and-announce rule does apply, it is not easy to determine what officers must do. How many seconds' wait are too few?" *Hudson, supra,* 547 *U.S.* at 590, 126 *S.Ct.* at 2163, 165 *L.Ed.*2d at 63. Reflecting on how best to gauge those concerns within the context of what is reasonable under the circumstances, the Supreme Court of the United States has observed that "[i]f our *ex post* evaluation is subject to such calculations, it is unsurprising that, *ex ante,* police officers about to encounter someone who may try to harm them will be uncertain how long to wait." *Ibid.*

In the calculus of reasonableness, "the time lapse [preceding forced entry need not be] extensive in length, depending on the circumstances of a given case." *Johnson, supra,* 168 *N.J.* at 621–22, 775 *A.*2d 1273 (citation omitted). "[T]his standard is 'necessarily vague,' and turns on the circumstances existing when the police execute the warrant." *State v. Rodriguez,* 399 *N.J.Super.* 192, 200, 943 *A.*2d 901 (App.Div.2008) (citation omitted). The facts relevant to that determination are circumscribed, as "the facts known to the police are what count in judging reasonable waiting time[.]" *United States v. Banks,* 540 *U.S.* 31, 39, 124 *S.Ct.* 521,

527, 157 *L.Ed.*2d 343, 354 (2003) (citation omitted). Hence, "the crucial fact in examining [law enforcement's] actions is not time to reach the door but the particular exigency claimed." *Id.* at 40, 124 *S.Ct.* at 527, 157 *L.Ed.*2d at 354. Particularly in narcotics cases, reasonableness in delay is not a function of merely "how long it would take the resident to reach the door, but how long it would take to dispose of the suspected drugs[.]" *Hudson, supra,* 547 *U.S.* at 590, 126 *S.Ct.* at 2163, 165 *L.Ed.*2d at 63. That consideration is fully part and parcel of New Jersey's jurisprudence. *See Johnson, supra,* 168 *N.J.* at 620, 775 *A.*2d 1273 ("In respect of the destructibility of heroin and cocaine, we take judicial notice of the fact that small quantities of narcotics sold out of a person's home are almost always susceptible to destruction or disposal."); *Rodriguez, supra,* 399 *N.J.Super.* at 201, 943 *A.*2d 901 (explaining that "the time it would reasonably take an occupant to answer the door" is not dispositive, but relevant as part of overall determination of reasonableness).

█ There are common factors to be applied in determining the reasonableness of the delay between knocking and announcing and a forcible entry. They include, but need not be limited to: a suspect's violent criminal history, *State v. Jones,* 179 *N.J.* 377, 399–400, 846 *A.*2d 569 (2004); an informant's tip that weapons will be present, *id.* at 400, 846 *A.*2d 569; the risks to officers' lives and safety, *id.* at 406, 846 *A.*2d 569; the size or layout of defendant's property, *Johnson, supra,* 168 *N.J.* at 620, 775 *A.*2d 1273; whether persons other than defendant reside there, *ibid.*; whether others involved in the crime are expected to be present, *ibid.*; and the time of day, *Rodriguez, supra,* 399 *N.J.Super.* at 201, 943 *A.*2d 901.

Examples incorporating and applying those factors abound, both within and without New Jersey. *See, e.g., Rodriguez, supra,* 399 *N.J.Super.* at 202, 943 *A.*2d 901 (concluding, in totality of circumstances, that "fifteen-to-twenty-second wait from the announcement ... was reasonable"); *Johnson, supra,* 168 *N.J.* at 621, 775 *A.*2d 1273 (citing William B. Bremer, *What Constitutes Compli-*

*ance with the Knock–and– Announce Rule in Search of Private Premises—State Cases*, 85 *A.L.R.* 5th 1 (2001) (describing cases in which courts have held time lapses ranging from fifteen seconds to ten minutes to be reasonable depending on particular circumstances)). Similar results obtain in the federal courts. *See Banks, supra*, 540 *U.S.* at 33, 124 *S.Ct.* at 523, 157 *L.Ed.*2d at 350 (ten to fifteen seconds at 2:00 p.m.); *United States v. Jones*, 133 *F.*3d 358, 362 (5th Cir.1998) ("In drug cases, where drug traffickers may so easily and quickly destroy the evidence of their illegal enterprise by simply flushing it down the drain, 15 to 20 seconds is certainly long enough for officers to wait before assuming the worst and making a forced entry.").

An objective application of the relevant factors placed in context therefore requires that we reject the Appellate Division's conclusion that the twenty-to thirty-second delay between the police officers knocking and announcing their purpose and their forcible entry into defendant's apartment was constitutionally insufficient. The totality of the circumstances presented—including, most significantly, the potential for the destruction of evidence while entry was delayed further, *Hudson, supra*, 547 *U.S.* at 590, 126 *S.Ct.* at 2163, 165 *L.Ed.*2d at 63—requires that we find there is sufficient credible evidence in the record to support the trial court's conclusion that the twenty-to thirty-second delay between Det. Sgt. Check knocking and announcing "Police department; search warrant" and the forcible entry was reasonable.

## C.

■ Focusing on the defendant's appellate complaints concerning the execution of the challenged warrant—complaints he never presented to the trial court—the Appellate Division also invalidated the search conducted pursuant to a valid warrant when it determined that "flash bang" devices can only be used in connection with a no-knock warrant. Because that issue never was raised before the trial court, because its factual antecedents never were subjected to the rigors of an adversary hearing, and because

its legal propriety never was ruled on by the trial court, the issue was not properly preserved for appellate review.

■ Appellate review is not limitless. The jurisdiction of appellate courts rightly is bounded by the proofs and objections critically explored on the record before the trial court by the parties themselves. Although "[o]ur rules do not perpetuate mere ritual[,]" we have insisted that, in opposing the admission of evidence, a litigant must "make known his position to the end that the trial court may consciously rule upon it." *State v. Abbott*, 36 *N.J.* 63, 76, 174 *A.*2d 881 (1961). This is so because "[t]he important fact is that the trial court was alerted to the basic problem[.]" *Id.* at 68, 174 *A.*2d 881. In short, the points of divergence developed in proceedings before a trial court define the metes and bounds of appellate review.

The reason for that limitation undergirds the very structure of our legal traditions. As eloquently explained by an experienced and revered appellate judge:

[A]ppellate courts in civil law jurisdictions will review issues of fact with little deference to trial court findings and will even receive new evidence . But, in the United States ... the ancient writ-of-error way of thinking still holds sway— the concept that the target of an appeal is the alleged error(s) of the trial judge, not whether a fresh view of facts and legal issues would command a different result. Consequently, our appellate courts step into the shoes of the trial judge and view the facts and issues as they were presented to him.

But there is more than history and tradition supporting our adherence to the record made below. There is an instinct of fairness due both the trial judge or agency and a litigant's adversary, a sense that one's opponent should have a chance to defend, explain, or rebut some challenged ruling and that the trial judge should have a clear first chance to address the issue. Indeed, if appellate courts were to consider some unpreserved issues but not others, depending on gradations of sympathy, the result would be an extremely uneven playing field.

There is also the canny recognition that if late-blooming issues were allowed to be raised for the first time on appeal, this would be an incentive for game-playing by counsel, for acquiescing through silence when risky rulings are made, and, when they can no longer be corrected at the trial level, unveiling them as new weapons on appeal. Finally, there is an element of institutional self-preservation in closing the door to what could be a flood of open-ended appellate opportunities.

[Frank M. Coffin, *On Appeal: Courts, Lawyering, and Judging* 84-85 (W.W. Norton & Co. 1994).]

New Jersey too has adhered to those long-standing principles. In this state,

> [i]t is a well-settled principle that our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest. [*Nieder v. Royal Indem. Ins. Co.*, 62 *N.J.* 229, 234, 300 *A.2d* 142 (1973) (citation and internal quotation marks omitted).]

No doubt, the limitation on the scope of appellate review is not absolute; it is subject to finite, qualified exceptions. *See Alan J. Cornblatt, P.A. v. Barow*, 153 *N.J.* 218, 230, 708 *A.2d* 401 (1998); *In re Bd. of Educ. of Boonton*, 99 *N.J.* 523, 536, 494 *A.2d* 279 (1985). Although our *Rules* envision the making of contemporaneous objections as the principal and almost exclusive means of preserving an issue for appeal, *see R.* 1:7–2, our trial and appellate courts are empowered, even in the absence of an objection, to acknowledge and address trial error if it is "of such a nature as to have been clearly capable of producing an unjust result," *R.* 1:7–5 (addressing trial errors); *see also R.* 2:10–2 (addressing appellate notice of trial errors). Further, our appellate courts retain the inherent authority to "notice plain error not brought to the attention of the trial court[,]" provided it is "in the interests of justice" to do so. *R.* 2:10–2. Yet, these exceptions are not without practical boundaries; they are not intended to supplant the obvious need to create a complete record and to preserve issues for appeal. To permit otherwise would allow the "clearly capable of producing an unjust result"/"interests of justice" standard of *Rule* 2:10–2 to render as mere surplusage the overarching requirement that matters be explored first and fully before a trial court.

Viewed in its proper setting, defendant's claim of unreasonableness in respect of the use of a "flash bang" device in the execution of the search warrant should not have been addressed on direct appeal. The factual shortcoming in this record is dispositive and largely of defendant's own making: when the State sought to explore the whys and wherefores of using the "flash bang" device, defendant objected based on the assertion that the testimony was

irrelevant to defendant's challenge—at that point limited to defendant's unsuccessful claim that the officers had failed to observe the knock-and-announce rule—and the trial court sustained that objection. Moreover, the failure to raise defendant's present claim during the motion to suppress denied the State the opportunity to confront the claim head-on; it denied the trial court the opportunity to evaluate the claim in an informed and deliberate manner; and it denied any reviewing court the benefit of a robust record within which the claim could be considered. Also, in the circumstances presented, it cannot be said that the trial court's failure to suppress the evidence obtained through the police's use of a "flash bang" device constituted trial error "of such a nature as to have been clearly capable of producing an unjust result." *R.* 2:10–2. Given this record, an appellate court should stay its hand and forego grappling with an untimely raised issue.

In violation of the clear command of *Rule* 2:6–2(a)(1), defendant never identified that his sole trial court challenge related to his claim that the officers did not knock prior to their forcible entry into defendant's apartment, a claim he abandoned on appeal. Having successfully barred the introduction of proofs concerning the use of a "flash bang" device before the trial court, defendant sought—for the first time on appeal—to claim that the use of that device was unreasonable. Tellingly, defendant never asserts that the failure to suppress the evidence secured by the use of a "flash bang" device in the execution of warrants creates an issue of trial error "clearly capable of producing an unjust result" that must be addressed "in the interests of justice[.]" *R.* 2:10–2. In fact, the only claim defendant raised on appeal concerning the use of a "flash bang" device falls far short of the Appellate Division's expansive pronouncement that "flash bang" devices may only be used with a "no-knock" warrant; even according to defendant's new-found argument on appeal, the use of "flash bang" devices should be limited by judicially mandated "guidelines" subject to judicially imposed limitations. He did not assert that their use without a finding sufficient to justify the issuance of a "no-knock" warrant constitutes error.

On the whole, then, it was inappropriate to consider, for the first time on appeal, defendant's belated challenge to the manner in which the warrant was executed. For that reason, the Appellate Division's reasoning and conclusion concerning the use of "flash bang" devices are rejected.[4]

### IV.

The judgment of the Appellate Division is reversed, and defendant's conviction and sentence are reinstated.

*For reversal and reinstatement*—Chief Justice RABNER and Justice LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.

---

[4] Based on *Hudson, supra*, 547 *U.S.* at 590–94, 126 *S.Ct.* at 2163–65, 165 *L.Ed.*2d at 66, the State also argues that the suppression of evidence is not the proper remedy when the only infirmity asserted is the claimed unreasonable execution of a valid warrant. In light of the disposition of this appeal, we need not reach that argument.