NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0703-15T2

GONZALO CHIRINO, FELIX
D. JAY, ANDREW ANKLE,
GARY JOSEPHS, RENE CAMPBELL,
ASTON HEMLEY and MARYAN VASYUTA,

    Plaintiffs-Respondents,

v.

PROUD 2 HAUL, INC., and IVANA
KOPROWSKI,

    Defendants-Appellants.

_____

> **APPROVED FOR PUBLICATION**
>
> **April 25, 2019**
>
> **APPELLATE DIVISION**

Argued March 16, 2017 — Decided November 30, 2017

Before Judges Alvarez, Accurso, and Manahan.[1]
(Judge Accurso dissenting).

On appeal from Superior Court of New Jersey,
Law Division, Hudson County, Docket No.
L-6191-11.

Frank G. Capece argued the cause for
appellants (Garrubbo & Capece, PC, attorneys
Mr. Capece, of counsel; James J. Seaman, on
the briefs).

David Tykulsker argued the cause for
respondents (David Tykulsker & Associates,
attorneys; Mr. Tykulsker, on the brief).

---

[1] Judge Manahan did not participate in oral argument. He joins
the opinion with counsel's consent. R. 2:13-2(b).

The opinion of the court was delivered by

ALVAREZ, P.J.A.D.

Plaintiffs are members of a certified class of truck owner-operators who deliver sealed containers originating at the Port of New Jersey to customers in the northeast. Defendant Proud 2 Haul, Inc. (P2H) is the company through which orders are placed, registered with the Federal Motor Carrier Safety Administration, and subject to Truth in Leasing (TIL) regulations, 49 C.F.R. pt. 376, in conjunction with the Motor Carrier Act (MCA), 49 U.S.C. §§ 13901, 13902, 14102, and 14704. Defendant Ivana Koprowski is P2H's principal. Plaintiffs' complaint, in broad terms, sought damages for defendants' failure to have lease agreements in place, as required by federal law, enumerating deductions to be taken from their payments. See § 49 C.F.R. 376.12. Over the course of nine months, plaintiffs were granted several orders awarding partial summary judgment. On the day scheduled for trial on the remaining issues, the parties settled the matter, preserving defendants' right to appeal some of the relief awarded by the orders. For the reasons that follow, we affirm.

Section 1B of the parties' settlement agreement[2] reads in pertinent part that defendants would appeal:

> [O]n a specific and delineated set of issues concerning the court's previous decision awarding damages under the [MCA] in its decisions of November 15, 2013; paragraph 2 of the decision of December 20, 2013; February 14, 2014; February 28, 2014 and paragraph 5 of the decision of July 11, 2014 ("the Appealable Orders").

In paragraph 7, the settlement agreement further states:

> Defendants shall limit their appeal to the Appealable Orders and shall limit the issues raised to
>
> > a. [W]hether proof of "exact damages" sustained by each plaintiff as opposed to a fair and reasonable estimate is required for monetary compensation under the [MCA], and
> >
> > b. [W]hether [d]efendants were required to have a written lease with the plaintiffs during the period from June 4, 2012, to March 31, 2014.

We briefly describe the relevant circumstances. Plaintiffs' causes of action arise in part from a November 19, 2010 lease agreement between them and P2H. That agreement provided that P2H

---

[2] Plaintiffs filed a motion to dismiss defendants' point one on the basis that the scope of the appeal exceeded the issue as framed in the settlement agreement. We agree, albeit for different reasons, and address the relief sought by way of motion in this opinion.

would reimburse taxes included in the price of diesel fuel for plaintiffs' trucks. Defendants initially claimed the agreement was void because it was entered into in error, later withdrawing that defense. The fuel taxes, like the other charges at issue, were not reimbursed and were actually deducted from the agreed-upon percentage of gross receipts paid to plaintiffs for making their deliveries.

As a convenience, P2H supplied plaintiffs with a Wright Express (WEX) Gas credit card that most owner-operators used to make their fuel purchases. The trucks run only on diesel fuel, however, the drivers were also permitted to use the card to purchase gasoline for their personal vehicles.

The remaining issues on appeal arise from a June 2012 agreement P2H entered into with Trucking Support Services, LLC, doing business as Contracts Resource Solutions (CRS). According to Koprowski, she entered into the arrangement to insure the drivers were considered independent contractors, and not defendants' employees. In accord with the agreement, CRS assumed responsibility for much of the paperwork generated by the deliveries, and the owners, in turn, entered into separate agreements leasing their equipment to CRS. Only P2H accepted and placed delivery orders. CRS in turn assigned the services and equipment it leased from the drivers to P2H. Plaintiffs' complaint

A-0703-15T2

alleged that defendants violated the TIL laws by virtue of the arrangement with CRS, in addition to violating the Wage Payment Law, N.J.S.A. 34:11-4.1, and engaged in acts of conversion and fraud.

Turning to the orders, the November 15, 2013 partial summary judgment enforced the lease agreement between the parties requiring reimbursement of the fuel taxes, and held that defendants violated its terms. Damages were calculated at $382,753.68. The court found defendants breached their contracts with plaintiffs, in violation of 49 C.F.R. § 376.12(h). The court's damage calculation was based on WEX records subpoenaed by plaintiffs. The court also awarded prejudgment interest of $18,663.17, $275,463.30 in attorney's fees, and $8,896.62 in costs.

Plaintiffs had difficulty obtaining the documents necessary to resolve the issue, as defendants' records suffered damage after Sandy, and therefore only WEX itself had a complete account of the charges. The WEX records, however, do not distinguish between diesel and gasoline purchases.

Furthermore, the records did not include diesel purchases made by drivers who elected not to use the WEX card. That calculation was resolved by way of the settlement, and defendants agreed to be liable for 69.70% of the amount plaintiffs' expert determined was owed.

5

In the trial court brief in opposition to plaintiffs' motion for summary judgment, defendants denied that they were bound by the lease term providing for reimbursement. They did not, however, argue that the judge's quantification of damages was erroneous, as a result of the possible inclusion of personal gasoline purchases made on the WEX card, or for any other reason.

They did not argue that the TIL regulations require damages to be exact. That argument was raised months later in the litigation, only with regard to plaintiffs' claim that $4,481,747.37 was due and owing in total to plaintiffs for other monies withheld from their pay. The argument was never raised with regard to the damage calculation for WEX users until the appeal was taken.

The trial court granted plaintiffs partial summary judgment on December 20, 2013, finding in Paragraph 2 that defendants were in violation of "49 C.F.R. § 376.12(a) as of May 27, 2012, by failing to have in place a written lease agreement with each owner-operator." The judge denied reconsideration of his decision on February 14, 2014.

In his reconsideration opinion, the judge observed that "defendants have abandoned their prior legal theory (that conforming leases with the 'owner' — meaning the owner-operators - were in existence) in favor of a new theory based on further

legal research by defense counsel in the 'definition' section of the TIL regulation."  In addition to further research conducted after the initial motion decision, defendants also consulted with an "unidentified expert."  The judge refused to grant relief based on a new legal theory after "more than nine months on various motions for summary judgment."

Defendants' new legal theory was that the members of the class were not the owners of the equipment as defined in TIL regulations, rather, that CRS was the owner.  Despite his rejection of the argument because it could have been made earlier, the judge went on to address its merits.  Defendants' new position hinged on their definition of "owner" as a person or entity having exclusive right to use of the equipment as found in the TIL regulations.  The judge rejected the theory.

The judge was unconvinced by the argument because of the agreement between CRS and defendants.  Paragraph 9 of the "Master Equipment Lease and Service Agreement" between CRS and P2H states:

> The parties expressly recognize, agree and warrant that CRS shall have no responsibility for the operation or direction of the equipment or the operations of the owners-operators or their drivers during the term of the relationship between the owners-operators and motor carrier as set forth in this agreement.  Motor carrier understands and agrees that it would be solely responsible for dispatching the owner-operators and equipment.  Motor carrier represents and

7

warrants that it shall comply with the federal leasing regulations with respect to owners-operators provided to motor carrier that have elected CRS settlement processing and related services. Motor carrier agrees to defend, indemnify and hold CRS harmless for any claims, suits, or actions, including reasonable attorney fees, incurred by CRS as a result of 1) the lack of sufficient insurance coverage by the motor carrier as required by paragraph 4(b) of this agreement during the term of this relationship between owner-operators; 2) any liability directly attributable to the exercise of the motor carrier's operational and directional responsibilities (including, but not limited to, any suits of discrimination, harassment, or other work place issues); 3) any action(s) by the owner-operator or their drivers that results in property damage, personal injury or death due to operation of the equipment; 4) any loss or damage to the cargo, products or goods transported by the owner-operator for the motor carrier.

In accord with that paragraph, plaintiffs used the equipment at only P2H's direction, thus in the judge's view P2H was required to comply with federal regulations even "with respect to owner-operators provided to motor carriers that here elected CRS settlement processing and related services."

The judge also opined that Paragraph 9 made it abundantly clear that CRS was not acting as the owner of the equipment. It acted solely as an administrative intermediary between the motor carrier and the owner-operators who made up the class of plaintiffs.

Furthermore, paragraph 1 of the agreement each owner-operator entered into with CRS states:

> During the term of this agreement, owner-operator shall provide CRS, and any authorized motor carrier with whom CRS may contract, with transportation-related services and that the equipment set forth below or in Schedule 1 ("Equipment"). It is acknowledged and understood that the equipment and driver services provided by owner-operator under this agreement shall in turn be leased to the motor carrier identified in Schedule 2 (the "motor carrier"). The parties understand and agree that CRS shall sublease the equipment to motor carrier during the term of this agreement[.]

The subleasing of the equipment through CRS was not exclusive, however. Since the owner-operators retained the ability to lease to others, CRS could not step in their shoes for purposes of determining their rights and P2H's responsibilities under 49 C.F.R. § 376.2(d)(2). Thus, CRS was not the owner-operator of the equipment because it did not have the right to exclusive use. Nothing in the agreement between CRS and the owner-operators forbid them from entering into agreements with other motor carriers.

Additionally, paragraph 6 of the agreement between P2H and CRS provided that P2H retains the "exclusive right to contract with owner-operators under the terms and upon such conditions as may be mutually agreed to between the motor carrier and owner-operators." In other words, regardless of the agreement with CRS, P2H had the right to directly contract with the owner-operators.

A-0703-15T2

The court also considered the "animating purpose of the TIL regulations [was] to protect the individual drivers from large trucking companies that possess an unfair advantage in bargaining power[,]" citing in support of that conclusion <u>Port Drivers Fed'n 18, Inc. v. All Saints Express, Inc.</u>, 757 <u>F. Supp.</u> 2d 443, 451 (D.N.J. 2010). The TIL regulations were not intended to allow for a "corporate intermediary" to be interjected between a motor carrier and owner-operators. To do so would effectively eliminate the motor carrier's obligation to comply with the MCA. In conclusion, the judge said:

> The court's initial finding that P2H violated the TIL regulations by not having a lease in place with the respective owner of each piece of equipment remains unchanged. The owner-operators, who are the members of the class, are the only 'owners' the court finds satisfy the TIL regulation definitions. [CRS's] 'use' of the equipment, if any, is not exclusive and therefore does not satisfy the definition set forth in 49 <u>C.F.R.</u> § 376.2(d)(2). Defendants argument that [CRS] should be considered the 'owner' and that the actual title-holders should be set aside while they are still engaged in the operation of their equipment does not comport with the TIL regulations or their animating purpose. No genuine issue of material fact exists. As a matter of law, plaintiffs remain entitled to summary judgment.

49 <u>C.F.R.</u> § 376.12 requires that licensed motor carriers have a written lease agreement with each owner-operator of equipment providing services. Since the court found the agreement between

10

defendants and CRS was not equivalent to a lease between a motor carrier and an owner-operator, it followed that no lease was in place at all.

The court declined to outright nullify the contract between P2H and CRS because the latter was not a party to the litigation. The court denied reconsideration of the December 20 order on February 14, 2014.

On February 28, 2014, the court quantified the damages attributable to P2H's failure to have written lease agreement at $4,481,747.37, the amount deducted from the owner/operators gross for certain items such as workers' compensation premiums. Prejudgment interest of $92,296.37, attorney's fees totaling $96,990.70, and costs of $4,276.27 were also granted.

Finally, on July 11, 2014, the court held defendants in violation of the MCA by virtue of their failure to have a lease agreement in place with plaintiffs during the first quarter of 2014. Damages were not fixed at that time, as the court concluded the issue was not ripe for summary judgment and deferred it to trial.

On appeal, defendants raise the following points:

Point I

THE QUANTUM OF FUEL TAX DAMAGES AWARDED BY THE TRIAL COURT WAS EXCESSIVE, CONTRARY TO THE "EXACT DAMAGES" SUSTAINED STANDARD AS PER 49

U.S.C.A. § 14704(a) AND SO MUST BE VACATED AND REMANDED.

Point II

IT WAS ERROR FOR THE TRIAL COURT TO RULE THAT ONLY OWNER OPERATOR DRIVERS COULD ENTER INTO A WRITTEN LEASE AGREEMENT FOR THEIR TRUCK EQUIPMENT WITH THE MOTOR CARRIER IN CONTRAVENTION OF THE TIL REGULATION DEFINITION OF "OWNER," 49 C.F.R. § 376.2(d).

I.

In reviewing summary judgment awards, we employ the same standard as did the trial court. W.J.A. v. D.A., 210 N.J. 229, 237 (2012). We determine if a "genuine issue of material fact" remains, and "if none exists, then decide whether the trial court's ruling on the law was correct." Id. at 237-38. We "view the evidence in the light most favorable to the non-moving party and analyze whether the moving party was entitled to judgment as a matter of law." Id. at 238 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995)).

II.

Defendants did not raise the issue of the accuracy or completeness of the WEX fuel records when the November 15, 2013, partial summary judgment was granted. Their argument that the "proper measure of damages for [] violation of the [TIL] regulations is the exact amount defendant overcharged or withheld

for each violation[,]" was in fact made long after that issue had been addressed by the trial judge, and only on appeal.

There can be no doubt that the "exact damages" argument was raised approximately nine months later in the motion decided July 11, 2014 — but about other losses. By then, the only outstanding question was whether defendants were liable, and if so, to what extent, for damages owed to class members on remaining deductions, such as for workers' compensation. The obligations based on the WEX records had already been decided months earlier. Defendants did not even mention those damages at that time. See Brinker v. Namcheck, 577 F. Supp. 2d 1052, 1055 (W.D. Wis. 2008). No Brinker argument was made regarding reimbursement for fuel taxes based on the WEX records until this appeal.

Defendants contend that regardless of when they asserted the claim, their right to challenge the judge's decision was preserved in the settlement agreement. But the agreement does not entitle them to make points on appeal not presented to the trial court. Defendants cannot, by agreement with plaintiffs, expand the universe of procedural options available upon appellate review. Defendants have the right to challenge the judge's decision on the issue of fuel taxes owed to class members, but not with new arguments.

13

Generally, we "decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available." State v. Witt, 223 N.J. 409, 419 (2015) (quoting State v. Robinson, 200 N.J. 1, 20 (2009)). However, this limitation is "subject to finite, qualified exceptions." Robinson, supra, 200 N.J. at 20. We address trial errors if they are "of such a nature as to have been clearly capable of producing an unjust result," or if it is in "the interests of justice" to do so. Ibid. We may also address an issue not brought to the trial court's attention if it is jurisdictional in nature or substantially implicates the public interest. N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 339 (2010).

Defendants' argument regarding the Brinker methodology does not fit into any exception. That the parties agreed defendants could appeal the award does not compel us to consider the facts and the theory defendants now advance, which plaintiffs never had the opportunity to refute. See Witt, supra, 223 N.J. at 419 (finding "it would be unfair, and contrary to our established rules," to decide an issue when the respondent was "deprived of the opportunity to establish a record that might have resolved the issue"). Defendant did not make this argument initially when

partial summary judgment was ordered, thus we will not reach it at this time.

III.

Defendants' second point, that the partial summary judgment with regard to the definition of "owner" in the MCA was error, encompasses the remaining orders on appeal. Defendants contend that "owner," pursuant to 49 C.F.R. § 376.2(d), includes CRS. They argue that CRS was an entity that "without title, has the right of exclusive use of equipment . . ."

49 C.F.R. § 376.11(a) states that an "authorized carrier" may perform transportation "in equipment it does not own" only if there is a "written lease granting the use of the equipment and meeting the requirements contained in § 376.12." 49 C.F.R. § 376.12(a) further requires that "[t]he lease shall be made between the authorized carrier and the owner of the equipment." CRS did not have the right to "exclusive use" of plaintiff's equipment. Thus, the agreement through the intermediary corporation did not satisfy the lease requirement in the TIL regulations.

In the most literal sense, the agreements are devoid of any language that makes CRS's relationship to plaintiffs exclusive, one prohibiting them from entering into contractual arrangements with other motor carriers. In fact, the contract allowed for

15

direct arrangements to be made between the owner-operators and P2H.

The agreement with CRS was entered into solely for P2H's convenience, not either at the instigation of the plaintiffs or to their benefit. If CRS agreed that P2H had the absolute right to contract directly with plaintiffs, even during the lease term, CRS did not have the exclusive right to the equipment. CRS did not have title to, the right to exclusive use, or lawful possession of plaintiff's equipment. Hence, it was not an owner under 49 C.F.R. § 376(d). By employing plaintiff's equipment and services through contracts with CRS that essentially created a wall between the owner-operators and the motor carrier, as a matter of law, defendants violated 49 C.F.R. §§ 376.11 and 376.12.

Defendants contend that a 1961 report, Lease And Interchange Of Vehicle By Motor Carriers, 84 M.C.C. 247 ex parte no. M.C. 43 supports their position that the primary purpose for the TIL regulations is to protect the public, not the owner-operators. The trial court disagreed, as do we.

The regulations themselves, which followed the ICC report by eighteen years, clarify that the TIL regulations are intended to protect individual drivers from large trucking concerns, because the companies possess an unfair advantage. Port Drivers Fed'n 18, Inc., 757 F. Supp. 2d at 451; see also Operator Indep. Drivers

<u>Ass'n v. Comerica Bank</u>, 636 <u>F.</u> 3d 781, 795-96 (6th Cir. 2011)(describing the difficulties faced by owner-operators that the regulations were promulgated to remedy); <u>Owner-Operator Indep. Drivers Ass'n v. Swift Transp. Co.</u>, 367 <u>F.</u> 3d 1108, 1110 (9th Cir. 2004)("A primary goal of this regulatory scheme is to prevent large carriers from taking advantage of individual owner-operators due to their weak bargaining position.")  In light of that context, and the agreements between defendants, CRS, and plaintiffs, we conclude that defendants' second point also lacks merit.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

17

**ACCURSO, J.A.D., dissenting.**

I have no quarrel with the majority's rejection of defendants' argument that CRS was the owner of the trucks belonging to members of the class under 49 C.F.R. § 376.2(d). But I cannot agree that because defendants failed to catch an obvious error in the calculation of the fuel tax damages awarded on partial summary judgment, they were thereafter barred from attempting to correct the mistake. Because I think that result inconsistent with the interlocutory nature of the order and unjust, I respectfully dissent from that aspect of the majority's decision.

The issue on appeal relating to the fuel tax damages is a narrow one. The leases in effect between the parties from November 19, 2010 through May 26, 2012, made defendant P2H responsible to "pay all fuel taxes." Every week, defendants deducted the drivers' fuel purchases from their pay, without remitting the fuel taxes. Accordingly, among the damages plaintiffs sought in this case was reimbursement for the fuel taxes defendants wrongfully charged plaintiff drivers.

Calculation of those fuel taxes turned out to be difficult for two reasons; Super Storm Sandy destroyed most of defendants' records, and the drivers no longer had the weekly settlement

sheets defendants provided them or receipts for fuel purchases. Plaintiffs took a two-pronged approach to dealing with those proof problems. They subpoenaed Wright Express for the records of fuel purchases by those drivers paying for fuel with a WEX card. For those drivers who instead paid cash for fuel, class counsel turned to an accountant who calculated the fuel tax owed the remaining members of the class by making estimates and assumptions based on available data.

It is undisputed that the trucks driven by the class operate only on diesel fuel. Defendants, however, did not limit the drivers to diesel fuel purchases with their WEX cards. Accordingly, some drivers used their WEX cards to buy gasoline for their personal vehicles. In its subpoena to Wright Express, class counsel sought records of all fuel purchases for the years in question. Using the WEX records, class counsel calculated the amount defendants owed those drivers using WEX cards by applying the tax rates in effect in the state where the fuel was purchased multiplied by the number of gallons purchased, without differentiating between gasoline and diesel fuel purchases.

When plaintiffs moved for partial summary judgment in 2013 for defendants' failure to pay fuel taxes for those drivers using WEX cards, discovery was still ongoing. Defendants opposed the motion but did not challenge class counsel's

A-0703-15T2

calculation of the fuel tax charges for those drivers. The court thus treated the calculation as undisputed and entered partial summary judgment for plaintiffs in the sum of $382,753.68.

Defendants appear not to have realized that the $382,753.68 included fuel taxes for gasoline purchases (which defendants had no obligation to pay) until almost a year later, when they were opposing plaintiffs' motion for summary judgment on liability and damages for fuel taxes to class members who made their fuel purchases in cash, not using a WEX card. Defendants argued the point to the court, among others, in attempting to establish the existence of factual disputes precluding summary judgment. Although the court entered a judgment for liability on the non-WEX card claims, it declined to fix damages on the motion. Agreeing with defendants that the facts underlying plaintiffs' damage claim were in dispute, the court left the claims for fuel tax damages arising out of cash purchases by the non-WEX card users for trial.

Based on the court having denied summary judgment on damages for fuel taxes on cash purchases, defendants moved for reconsideration of another order on damages entered months before, contending the plaintiffs' calculations were erroneous and contrary to law. Defendants argued that plaintiffs were

required to prove the actual amount of their damages and that projections, estimates and imputations were insufficient.  In their brief in support of that motion, defendants footnoted the policy permitting drivers to use their WEX cards to purchase gasoline for their personal vehicles.  The court denied the motion, and the parties subsequently settled their claims with an agreement that defendants would pay 69.70% of what plaintiffs' expert claimed was owed the drivers paying cash for fuel, and could appeal the $382,753.68 judgment for fuel taxes owed drivers using WEX cards based on plaintiffs' failure to prove the "exact damages" sustained by those drivers.

In refusing to consider the claim on the merits, the majority acknowledges that defendants finally woke to the inexactness of the damage calculation for the WEX card users and raised it to the trial court in July 2014, when they opposed plaintiffs' damages calculation for fuel taxes owed the non-WEX card users; a fact borne out by the motion transcript.  It also acknowledges the parties settled the case with an express agreement permitting defendants to challenge the WEX card calculation on appeal.  Relying on State v. Witt, 223 N.J. 409 (2015), and State v. Robinson, 200 N.J. 1 (2009), the majority nevertheless refuses to consider the merits of defendants' argument on the WEX card calculation because they failed to make

A-0703-15T2

the argument to the trial court when the court entered partial summary judgment on the WEX card claim.

Witt and Robinson, criminal cases dealing with suppression motions, are neither controlling nor instructive here. In both those cases, the Court was addressing the failure of defendants to preserve an issue for appellate review; in Witt the lawfulness of a traffic stop, 223 N.J. at 418-19, and in Robinson, the use of a "flash bang" device in connection with a knock-and-announce warrant, 200 N.J. at 18-22, neither ever raised to the trial court. Defendants raised the issue of the accuracy of the WEX fuel records to the trial court here. The majority holds, however, that defendants' failure to do so until after partial summary judgment had already been entered precludes our review of the issue. I disagree.

As the Court explained in Lombardi v. Masso, 207 N.J. 517 (2011), "[i]t is well established that 'the trial court has the inherent power to be exercised in its sound discretion, to review, revise, reconsider and modify its interlocutory orders at any time prior to the entry of final judgment.'" Id. at 534 (quoting Johnson v. Cyklop Strapping Corp., 220 N.J. Super. 250, 257 (App. Div. 1987), certif. denied, 110 N.J. 196 (1988)). Rule 4:42-2, which governs reconsideration of interlocutory orders, see R. 1:7-4(b), provides that "any order . . . which

adjudicates fewer than all the claims as to all the parties shall not terminate the action as to any of the claims, and it shall be subject to revision at any time before the entry of final judgment in the sound discretion of the court in the interest of justice."

Although defendants' failure to have timely realized that plaintiffs' calculation of fuel taxes for those drivers using WEX cards overstated the damages by including purchases of gasoline as well as diesel fuel is certainly not laudatory, it is not an incomprehensible error. Discovery was still ongoing, the records belonged to a third party, and class counsel represented in its statement of undisputed material facts that those records were confined to diesel fuel purchases, a statement defendants allege they only subsequently discovered was demonstrably false.[1]

On appeal, defendants have submitted a supplemental appendix, using the same WEX card records submitted by plaintiffs on the motion, along with additional records obtained from Wright Express that break down the fuel purchases between diesel fuel and gasoline. Defendants claim a comparison of the

---

[1] Defendants nowhere suggest the error was anything other than inadvertent.

A-0703-15T2

documents demonstrates plaintiffs overstated their damages by more than $20,000 by including purchases of gasoline.

Plaintiffs make no response to any of defendants' particularized claims. Instead, they contend only that they based their calculation of "the amount of the fuel tax each Class member paid" on "the information WEX provided," and that the court should not consider the argument that they improperly included the fuel taxes on gasoline purchased for the class members' personal use because defendants never raised that particular argument when they were arguing the need to prove exact damages in the trial court. Pointedly, plaintiffs do not represent on appeal that their damage calculation was limited to the fuel tax charges on purchases of diesel fuel.

Because defendants raised the issue of plaintiffs' need to establish actual, "exact" damages on their fuel tax claims under the TIL regulations when successfully defending against summary judgment on damages for the non-WEX fuel purchases, and then moved for reconsideration of a prior order on damages on the same grounds, that issue was properly preserved for appellate review, notwithstanding that defendants failed to make the argument on the initial motion on the WEX card purchases. See Docteroff v. Barra Corp. of Am., Inc., 282 N.J. Super. 230, 237 (App. Div. 1995) ("[W]e need not get caught up in the question

concerning the extent to which plaintiffs have shifted gears or changed their position regarding the appropriate statute of limitations. Because the issues before the trial judge dealt with whether the suit was timely and what the controlling limitations period was, we will consider the same issues as presented to us, regardless of whether plaintiffs' principal theory has changed."). We may thus consider whether the proofs plaintiffs presented on the motion for partial summary judgment for fuel taxes owed the WEX card users was sufficient to establish their damages. See Lombardi, supra, 207 N.J. at 542.

Given plaintiffs' acknowledgment that WEX card users could and did use their cards for personal gasoline purchases and what could be termed, at best, an ambiguity as to whether the WEX records on which plaintiffs based their damages were limited to diesel fuel purchases or included gasoline purchases for which no fuel taxes were due, I would vacate the order for partial summary judgment and remand for a proper calculation of damages. See Ziegelheim v. Apollo, 128 N.J. 250, 264 (1992) ("Summary judgment should not be granted when the moving party demonstrates through its own submissions that there is a genuine dispute over material fact, regardless of the presence or absence of submissions by the opposing party.").

The "special power afforded to judges over their interlocutory orders derives from the fact that cases continue to develop after orders have been entered." Lombardi, supra, 207 N.J. at 536. That was clearly the case here, where the court entered a whole series of partial summary judgments on discrete issues over the course of discovery. Although defendants did not raise the error in plaintiffs' calculation of the fuel tax damages for WEX users until well after partial summary judgment had been entered on the claim, and never did so in as clear a fashion as they have on appeal, they plainly challenged the accuracy of the fuel tax calculations for all fuel purchases, whether paid for in cash or with a WEX card, before trial and entry of final judgment. Accordingly, I think we are obliged to consider the issue on the merits.

Affirming the judgment without substantive review in these admittedly unusual circumstances raises the unpalatable specter of permitting a likely erroneous damage calculation to stand because defendants failed to catch the error before entry of an interlocutory order for partial summary judgment. Because I think that result inconsistent with the nature of the order and unjust on the facts presented, I respectfully dissent.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0703-15T2