NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R. 1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-0703-15T2

GONZALO CHIRINO, FELIX
D. JAY, ANDREW ANKLE,
GARY JOSEPHS, RENE CAMPBELL,
ASTON HEMLEY and MARYAN VASYUTA,

 Plaintiffs-Respondents,

v.

PROUD 2 HAUL, INC., and IVANA
KOPROWSKI,

 Defendants-Appellants.

________________________________

 Argued March 16, 2017 – Decided November 30, 2017

 Before Judges Alvarez, Accurso, and Manahan.1
 (Judge Accurso dissenting).

 On appeal from Superior Court of New Jersey,
 Law Division, Hudson County, Docket No.
 L-6191-11.

 Frank G. Capece argued the cause for
 appellants (Garrubbo & Capece, PC, attorneys
 (Mr. Capece, of counsel; James J. Seaman, on
 the briefs).

1
 Judge Manahan did not participate in oral argument. He joins
the opinion with counsel's consent. R. 2:13-2(b).
 David Tykulsker argued the cause for
 respondents (David Tykulsker & Associates,
 attorneys; Mr. Tykulsker, on the brief).

PER CURIAM

 Plaintiffs are members of a certified class of truck owner-

operators who deliver sealed containers originating at the Port

of New Jersey to customers in the northeast. Defendant Proud 2

Haul, Inc. (P2H) is the company through whom orders are placed,

registered with the Federal Motor Carrier Safety Administration,

and subject to Truth in Leasing (TIL) regulations, 49 C.F.R. pt.

376, in conjunction with the Motor Carrier Act (MCA), 49 U.S.C.

§§ 13901, 13902, 14102, and 14704. Defendant Ivana Koprowski is

P2H's principal. Plaintiffs' complaint, in broad terms, sought

damages for defendants' failure to have lease agreements in place,

as required by federal law, enumerating deductions to be taken

from their payments. See § 49 C.F.R. 376.12. Over the course of

nine months, plaintiffs were granted several orders awarding

partial summary judgment. On the day scheduled for trial on the

remaining issues, the parties settled the matter, preserving

defendants' right to appeal some of the relief awarded by the

orders. For the reasons that follow, we affirm.

 2 A-0703-15T2
 Section 1B of the parties' settlement agreement2 reads in

pertinent part that defendants would appeal:

 [O]n a specific and delineated set of issues
 concerning the court's previous decision
 awarding damages under the [MCA] in its
 decisions of November 15, 2013; paragraph 2
 of the decision of December 20, 2013; February
 14, 2014; February 28, 2014 and paragraph 5
 of the decision of July 11, 2014 ("the
 Appealable Orders").

In paragraph 7, the settlement agreement further states:

 Defendants shall limit their appeal to the
 Appealable Orders and shall limit the issues
 raised to

 a. [W]hether proof of "exact
 damages" sustained by each
 plaintiff as opposed to a fair and
 reasonable estimate is required for
 monetary compensation under the
 [MCA], and

 b. [W]hether [d]efendants were
 required to have a written lease
 with the plaintiffs during the
 period from June 4, 2012, to March
 31, 2014.

 We briefly describe the relevant circumstances. Plaintiffs'

causes of action arise in part from a November 19, 2010 lease

agreement between them and P2H. That agreement provided that P2H

2
 Plaintiffs filed a motion to dismiss defendants' point one on
the basis that the scope of the appeal exceeded the issue as framed
in the settlement agreement. We agree, albeit for different
reasons, and address the relief sought by way of motion in this
opinion.

 3 A-0703-15T2
would reimburse taxes included in the price of diesel fuel for

plaintiffs' trucks. Defendants initially claimed the agreement

was void because it was entered into in error, later withdrawing

that defense. The fuel taxes, like the other charges at issue,

were not reimbursed and were actually deducted from the agreed-

upon percentage of gross receipts paid to plaintiffs for making

their deliveries.

 As a convenience, P2H supplied plaintiffs with a Wright

Express (WEX) Gas credit card that most owner-operators used to

make their fuel purchases. The trucks run only on diesel fuel,

however, the drivers were also permitted to use the card to

purchase gasoline for their personal vehicles.

 The remaining issues on appeal arise from a June 2012

agreement P2H entered into with Trucking Support Services, LLC,

doing business as Contracts Resource Solutions (CRS). According

to Koprowski, she entered into the arrangement to insure the

drivers were considered independent contractors, and not

defendants' employees. In accord with the agreement, CRS assumed

responsibility for much of the paperwork generated by the

deliveries, and the owners, in turn, entered into separate

agreements leasing their equipment to CRS. Only P2H accepted and

placed delivery orders. CRS in turn assigned the services and

equipment it leased from the drivers to P2H. Plaintiffs' complaint

 4 A-0703-15T2
alleged that defendants violated the TIL laws by virtue of the

arrangement with CRS, in addition to violating the Wage Payment

Law, N.J.S.A. 3:11-4.1 to -24.3, and engaged in acts of conversion

and fraud.

 Turning to the orders, the November 15, 2013 partial summary

judgment enforced the lease agreement between the parties

requiring reimbursal of the fuel taxes, and held that defendants

violated its terms. Damages were calculated at $382,753.68. The

court found defendants breached their contracts with plaintiffs,

in violation of 49 C.F.R. § 376.12(h). The court's damage

calculation was based on WEX records subpoenaed by plaintiffs.

The court also awarded prejudgment interest of $18,663.17,

$275,463.30 in attorney's fees, and $8,896.62 in costs.

 Plaintiffs had difficulty obtaining the documents necessary

to resolve the issue, as defendants' records suffered damage after

Sandy, and therefore only WEX itself had a complete account of the

charges. The WEX records, however, do not distinguish between

diesel and gasoline purchases.

 Furthermore, the records did not include diesel purchases

made by drivers who elected not to use the WEX card. That

calculation was resolved by way of the settlement, and defendants

agreed to be liable for 69.70% of the amount plaintiffs' expert

determined was owed.

 5 A-0703-15T2
 In the trial court brief in opposition to plaintiffs' motion

for summary judgment, defendants denied that they were bound by

the lease term providing for reimbursement. They did not, however,

argue that the judge's quantification of damages was erroneous,

as a result of the possible inclusion of personal gasoline

purchases made on the WEX card, or for any other reason.

 They did not argue that the TIL requires damages to be exact.

That argument was raised months later in the litigation, only with

regard to plaintiffs' claim that $4,481,747.37 was due and owing

in total to plaintiffs for other monies withheld from their pay.

The argument was never raised with regard to the damage calculation

for WEX users until the appeal was taken.

 The trial court granted plaintiffs partial summary judgment

on December 20, 2013, finding in Paragraph 2 that defendants were

in violation of "49 C.F.R. § 376.12(a) as of May 27, 2012, by

failing to have in place a written lease agreement with each owner-

operator." The judge denied reconsideration of his decision on

February 14, 2014.

 In his reconsideration opinion, the judge observed that

"defendants have abandoned their prior legal theory (that

conforming leases with the 'owner' – meaning the owner-operators

- were in existence) in favor of a new theory based on further

legal research by defense counsel in the 'definition' section of

 6 A-0703-15T2
the TIL regulation." In addition to further research conducted

after the initial motion decision, defendants also consulted with

an "unidentified expert." The judge refused to grant relief based

on a new legal theory after "more than nine months on various

motions for summary judgment."

 Defendants' new legal theory was that the members of the

class were not the owners of the equipment as defined in TIL

regulations, rather, that CSR was the owner. Despite his rejection

of the argument because it could have been made earlier, the judge

went on to address its merits. Defendants' new position hinged

on their definition of "owner" as a person or entity having

exclusive right to use of the equipment as found in the TIL

regulations. The judge rejected the theory.

 The judge was unconvinced by the argument because of the

agreement between CRS and defendants. Paragraph 9 of the "Master

Equipment Lease and Service Agreement" between CRS and P2H states:

 The parties expressly recognize, agree and
 warrant that CRS shall have no responsibility
 for the operation or direction of the
 equipment or the operations of the owners-
 operators or their drivers during the term of
 the relationship between the owners-operators
 and motor carrier as set forth in this
 agreement. Motor carrier understands and
 agrees that it would be solely responsible for
 dispatching the owner-operators and
 equipment. Motor carrier represents and
 warrants that it shall comply with the federal
 leasing regulations with respect to owners-

 7 A-0703-15T2
 operators provided to motor carrier that have
 elected CRS settlement processing and related
 services. Motor carrier agrees to defend,
 indemnify and hold CRS harmless for any
 claims, suits, or actions, including
 reasonable attorney fees, incurred by CRS as
 a result of 1) the lack of sufficient
 insurance coverage by the motor carrier as
 required by paragraph 4(b) of this agreement
 during the term of this relationship between
 owner-operators; 2) any liability directly
 attributable to the exercise of the motor
 carrier's operational and directional
 responsibilities (including, but not limited
 to, any suits of discrimination, harassment,
 or other work place issues); 3) any action(s)
 by the owner-operator or their drivers that
 results in property damage, personal injury
 or death due to operation of the equipment;
 4) any loss or damage to the cargo, products
 or goods transported by the owner-operator for
 the motor carrier.

 In accord with that paragraph, plaintiffs used the equipment

at only P2H's direction, thus in the judge's view P2H was required

to comply with federal regulations even "with respect to owner-

operators provided to motor carriers that here elected CRS

settlement processing and related services."

 The judge also opined that Paragraph 9 made it abundantly

clear that CRS was not acting as the owner of the equipment. It

acted solely as an administrative intermediary between the motor

carrier and the owner-operators who made up the class of

plaintiffs.

 8 A-0703-15T2
 Furthermore, paragraph 1 of the agreement each owner-operator

entered into with CRS states:

 During the term of this agreement, owner-
 operator shall provide CRS, and any authorized
 motor carrier with whom CRS may contract, with
 transportation-related services and that the
 equipment set forth below or in Schedule 1
 ("Equipment"). It is acknowledged and
 understood that the equipment and driver
 services provided by owner-operator under this
 agreement shall in turn be leased to the motor
 carrier identified in Schedule 2 (the "motor
 carrier"). The parties understand and agree
 that CRS shall sublease the equipment to motor
 carrier during the term of this agreement[.]

 The subleasing of the equipment through CRS was not exclusive,

however. Since the owner-operators retained the ability to lease

to others, CRS could not step in their shoes for purposes of

determining their rights and P2H's responsibilities under 49

C.F.R. § 376.2(d)(2). Thus, CRS was not the owner-operator of the

equipment because it did not have the right to exclusive use.

Nothing in the agreement between CRS and the owner-operators forbid

them from entering into agreements with other motor carriers.

 Additionally, paragraph 6 of the agreement between P2H and

CRS provided that P2H retains the "exclusive right to contract

with owner-operators under the terms and upon such conditions as

may be mutually agreed to between the motor carrier and owner-

operators." In other words, regardless of the agreement with CRS,

P2H had the right to directly contract with the owner-operators.

 9 A-0703-15T2
 The court also considered the "animating purpose of the TIL

regulations [was] to protect the individual drivers from large

trucking companies that possess an unfair advantage in bargaining

power[,]" citing in support of that conclusion Port Drivers Fed'n

18, Inc. v. All Saints Express, Inc., 757 F. Supp. 2d 443, 451

(D.N.J. 2010). The TIL regulations were not intended to allow for

a "corporate intermediary" to be interjected between a motor

carrier and owner-operators. To do so would effectively eliminate

the motor carrier's obligation to comply with the MCA. In

conclusion, the judge said:

 The court's initial finding that P2H violated
 the TIL regulations by not having a lease in
 place with the respective owner of each piece
 of equipment remains unchanged. The owner-
 operators, who are the members of the class,
 are the only 'owners' the court finds satisfy
 the TIL regulation definitions. [CRS's] 'use'
 of the equipment, if any, is not exclusive and
 therefore does not satisfy the definition set
 forth in 49 C.F.R. § 376.2(d)(2). Defendants
 argument that [CRS] should be considered the
 'owner' and that the actual title-holders
 should be set aside while they are still
 engaged in the operation of their equipment
 does not comport with the TIL regulations or
 their animating purpose. No genuine issue of
 material fact exists. As a matter of law,
 plaintiffs remain entitled to summary
 judgment.

 49 C.F.R. § 376.12 requires that licensed motor carriers have

a written lease agreement with each owner-operator of equipment

providing services. Since the court found the agreement between

 10 A-0703-15T2
defendants and CRS was not equivalent to a lease between a motor

carrier and an owner-operator, it followed that no lease was in

place at all.

 The court declined to outright nullify the contract between

P2H and CRS because the latter was not a party to the litigation.

The court denied reconsideration of the December 20 order on

February 14, 2014.

 On February 28, 2014, the court quantified the damages

attributable to P2H's failure to have written lease agreement at

$4,481,747.37, the amount deducted from the owner/operators gross

for certain items such as workers' compensation premiums.

Prejudgment interest of $92,296.37, attorney's fees totaling

$96,990.70, and costs of $4,276.27 were also granted.

 Finally, on July 11, 2014, the court held defendants in

violation of the MCA by virtue of their failure to have a lease

agreement in place with plaintiffs during the first quarter of

2014. Damages were not fixed at that time, as the court concluded

the issue was not ripe for summary judgment and deferred it to

trial.

 On appeal, defendants raise the following points:

 Point I

 THE QUANTUM OF FUEL TAX DAMAGES AWARDED BY THE
 TRIAL COURT WAS EXCESSIVE, CONTRARY TO THE
 "EXACT DAMAGES" SUSTAINED STANDARD AS PER 49

 11 A-0703-15T2
 U.S.C.A. § 14704(a) AND SO MUST BE VACATED AND
 REMANDED.

 Point II

 IT WAS ERROR FOR THE TRIAL COURT TO RULE THAT
 ONLY OWNER OPERATOR DRIVERS COULD ENTER INTO
 A WRITTEN LEASE AGREEMENT FOR THEIR TRUCK
 EQUIPMENT WITH THE MOTOR CARRIER IN
 CONTRAVENTION OF THE TIL REGULATION DEFINITION
 OF "OWNER", 49 C.F.R. § 376.2(d).

 I.

 In reviewing summary judgments awards, we employ the same

standard as did the trial court. W.J.A. v. D.A., 210 N.J. 229,

237 (2012). We determine if a "genuine issue of material fact"

remains, and "if none exists, then decide whether the trial court's

ruling on the law was correct." Id. at 237-38. We "view the

evidence in the light most favorable to the non-moving party and

analyze whether the moving party was entitled to judgment as a

matter of law." Id. at 238. (citing Brill v. Guardian Life Ins.

Co. of Am., 142 N.J. 520, 523 (1995)).

 II.

 Defendants did not raise the issue of the accuracy or

completeness of the WEX fuel records when the November 15, 2013,

partial summary judgment was granted. Their argument that the

"proper measure of damages for [] violation of the [TIL]

regulations is the exact amount defendant overcharged or withheld

 12 A-0703-15T2
for each violation[,]" was in fact made long after that issue had

been addressed by the trial judge, and only on appeal.

 There can be no doubt that the "exact damages" argument was

raised approximately nine months later in the motion decided July

11, 2014 — but about other losses. By then, the only outstanding

question was whether defendants were liable, and if so, to what

extent, for damages owed to class members on remaining deductions,

such as for workers' compensation. The obligations based on the

WEX records had already been decided months earlier. Defendants

did not even mention those damages at that time. See Brinker v.

Namcheck, 577 F. Supp. 2d 1052, 1055 (W.D. Wisc. 2008). No Brinker

argument was made regarding reimbursement for fuel taxes based on

the WEX records until this appeal.

 Defendants contend that regardless of when they asserted the

claim, their right to challenge the judge's decision was preserved

in the settlement agreement. But the agreement does not entitle

them to make points on appeal not presented to the trial court.

Defendants cannot, by agreement with plaintiffs, expand the

universe of procedural options available upon appellate review.

Defendants have the right to challenge the judge's decision on the

issue of fuel taxes owed to class members, but not with new

arguments.

 13 A-0703-15T2
 Generally, we "decline to consider questions or issues not

properly presented to the trial court when an opportunity for such

a presentation is available." State v. Witt, 223 N.J. 409, 419

(2015) (quoting State v. Robinson, 200 N.J. 1, 20 (2009)).

However, this limitation is "subject to finite, qualified

exceptions." Robinson, supra, 200 N.J. at 20. We address trial

errors if they are "of such a nature as to have been clearly

capable of producing an unjust result," or if it is in "the

interests of justice" to do so. Ibid. We may also address an

issue not brought to the trial court's attention if it is

jurisdictional in nature or substantially implicates the public

interest. N.J. Div. of Youth and Family Servs. v. M.C. III, 201

N.J. 328, 339 (2010).

 Defendants' argument regarding the Brinker methodology does

not fit into any exception. That the parties agreed defendants

could appeal the award does not compel us to consider the facts

and the theory defendants now advance, which plaintiffs never had

the opportunity to refute. See Witt, supra, 223 N.J. at 419

(finding "it would be unfair, and contrary to established rules,"

to decide an issue when the respondent was "deprived of the

opportunity to establish a record that might have resolved the

issue"). Defendant did not make this argument initially when

 14 A-0703-15T2
partial summary judgment was ordered, thus we will not reach it

at this time.

 III.

 Defendants' second point, that the partial summary judgment

with regard to the definition of "owner" in the MCA was error,

encompasses the remaining orders on appeal. Defendants contend

that "owner," pursuant to 49 C.F.R. § 376.2(d), includes CRS. They

argue that CRS was an entity that "without title, has the right

of exclusive use of equipment . . ."

 49 C.F.R. § 376.11(a) states that an "authorized carrier" may

perform transportation "in equipment it does not own" only if

there is a "written lease granting the use and meeting the

requirements contained in § 376.12." 49 C.F.R. § 376.12(a) further

requires that "[t]he lease shall be made between the authorized

carrier and the owner of the equipment." CRS did not have the

right to "exclusive use" of plaintiff's equipment. Thus, the

agreement through the intermediary corporation did not satisfy the

lease requirement in the TIL regulations.

 In the most literal sense, the agreements are devoid of any

language that makes CRS's relationship to plaintiffs exclusive,

one prohibiting them from entering into contractual arrangements

with other motor carriers. In fact, the contract allowed for

 15 A-0703-15T2
direct arrangements to be made between the owner-operators and

P2H.

 The agreement with CRS was entered into solely for P2H's

convenience, not either at the instigation of the plaintiffs or

to their benefit. If CRS agreed that P2H had the absolute right

to contract directly with plaintiffs, even during the lease term,

CRS did not have the exclusive right to the equipment. CRS did

not have title to, the right to exclusive use, or lawful possession

of plaintiff's equipment. Hence, it was not an owner under 49

C.F.R. § 376(d). By employing plaintiff's equipment and services

through contracts with CRS that essentially created a wall between

the owner-operators and the motor carrier, as a matter of law,

defendants violated 49 C.F.R. §§ 376.11 and 376.12.

 Defendants contend that a 1961 report, Lease And Interchange

Of Vehicle By Motor Carriers, 84 M.C.C. 247 ex parte no. M.C. 43

supports their position that the primary purpose for the TIL

regulations is to protect the public, not the owner-operators.

The trial court disagreed, as do we.

 The regulations themselves, that followed the ICC report by

eighteen years, clarify that the TIL regulations are intended to

protect individual drivers from large trucking concerns, because

the companies possess an unfair advantage. Port Drivers Fed'n 18,

Inc. v. All Saints Express, Inc., 757 F. Supp. 2d 443, 451 (D.N.J.

 16 A-0703-15T2
2010); See also Operator Independent Driver's Ass'n v. Comerica

Bank, 636 F. 3d 781, 795-796 (6th Cir. 2011)(describing the

difficulties faced by owner-operators that the regulations were

promulgated to remedy); Owner-Operator Independent Drivers Ass'n

v. Swift Transp. Co., 367 F. 3d 1108, 1110 (9th Cir. 2004)("A

primary goal of this regulatory scheme is to prevent large carriers

from taking advantage of individual owner-operators due to their

weak bargaining position.") In light of that context, and the

agreements between defendants, CRS, and plaintiffs, we conclude

that defendants' second point also lacks merit.

 Affirmed.

 17 A-0703-15T2
_________________________________

ACCURSO, J.A.D., dissenting.

 I have no quarrel with the majority's rejection of

defendants' argument that CRS was the owner of the trucks

belonging to members of the class under 49 C.F.R. § 376.2(d).

But I cannot agree that because defendants failed to catch an

obvious error in the calculation of the fuel tax damages awarded

on partial summary judgment, they were thereafter barred from

attempting to correct the mistake. Because I think that result

inconsistent with the interlocutory nature of the order and

unjust, I respectfully dissent from that aspect of the

majority's decision.

 The issue on appeal relating to the fuel tax damages is a

narrow one. The leases in effect between the parties from

November 19, 2010 through May 26, 2012, made defendant P2H

responsible to "pay all fuel taxes." Every week, defendants

deducted the drivers' fuel purchases from their pay, without

remitting the fuel taxes. Accordingly, among the damages

plaintiffs sought in this case was reimbursement for the fuel

taxes defendants wrongfully charged plaintiff drivers.

 Calculation of those fuel taxes turned out to be difficult

for two reasons; Super Storm Sandy destroyed most of defendants'

records, and the drivers no longer had the weekly settlement
sheets defendants provided them or receipts for fuel purchases.

Plaintiffs took a two-pronged approach to dealing with those

proof problems. They subpoenaed Wright Express for the records

of fuel purchases by those drivers paying for fuel with a WEX

card. For those drivers who instead paid cash for fuel, class

counsel turned to an accountant who calculated the fuel tax owed

the remaining members of the class by making estimates and

assumptions based on available data.

 It is undisputed that the trucks driven by the class

operate only on diesel fuel. Defendants, however, did not limit

the drivers to diesel fuel purchases with their WEX cards.

Accordingly, some drivers used their WEX cards to buy gasoline

for their personal vehicles. In its subpoena to Wright Express,

class counsel sought records of all fuel purchases for the years

in question. Using the WEX records, class counsel calculated

the amount defendants owed those drivers using WEX cards by

applying the tax rates in effect in the state where the fuel was

purchased times the number of gallons purchased, without

differentiating between gasoline and diesel fuel purchases.

 When plaintiffs moved for partial summary judgment in 2013

for defendants' failure to pay fuel taxes for those drivers

using WEX cards, discovery was still ongoing. Defendants

opposed the motion but did not challenge class counsel's

 2 A-0703-15T2
calculation of the fuel tax charges for those drivers. The

court thus treated the calculation as undisputed and entered

partial summary judgment for plaintiffs in the sum of

$382,753.68.

 Defendants appear not to have realized that the $382,753.68

included fuel taxes for gasoline purchases (which defendants had

no obligation to pay) until almost a year later, when they were

opposing plaintiffs' motion for summary judgment on liability

and damages for fuel taxes to class members who made their fuel

purchases in cash, not using a WEX card. Defendants argued the

point to the court, among others, in attempting to establish the

existence of factual disputes precluding summary judgment.

Although the court entered a judgment for liability on the non-

WEX card claims, it declined to fix damages on the motion.

Agreeing with defendants that the facts underlying plaintiffs'

damage claim were in dispute, the court left the claims for fuel

tax damages arising out of cash purchases by the non-WEX card

users for trial.

 Based on the court having denied summary judgment on

damages for fuel taxes on cash purchases, defendants moved for

reconsideration of another order on damages entered months

before, contending the plaintiffs' calculations were erroneous

and contrary to law. Defendants argued that plaintiffs were

 3 A-0703-15T2
required to prove the actual amount of their damages and that

projections, estimates and imputations were insufficient. In

their brief in support of that motion, defendants footnoted the

policy permitting drivers to use their WEX cards to purchase

gasoline for their personal vehicles. The court denied the

motion, and the parties subsequently settled their claims with

an agreement that defendants would pay 69.70% of what

plaintiffs' expert claimed was owed the drivers paying cash for

fuel, and could appeal the $382,753.68 judgment for fuel taxes

owed drivers using WEX cards based on plaintiffs' failure to

prove the "exact damages" sustained by those drivers.

 In refusing to consider the claim on the merits, the

majority acknowledges that defendants finally woke to the

inexactness of the damage calculation for the WEX card users and

raised it to the trial court in July 2014, when they opposed

plaintiffs' damages calculation for fuel taxes owed the non-WEX

card users. A fact borne out by the motion transcript. It

also acknowledges the parties settled the case with an express

agreement permitting defendants to challenge the WEX card

calculation on appeal. Relying on Witt and Robinson, the

majority nevertheless refuses to consider the merits of

defendants' argument on the WEX card calculation because they

 4 A-0703-15T2
failed to make the argument to the trial court when the court

entered partial summary judgment on the WEX card claim.

 Witt and Robinson, criminal cases dealing with suppression

motions, are neither controlling nor instructive here. In both

those cases, the Court was addressing the failure of defendants

to preserve an issue for appellate review; in Witt the

lawfulness of a traffic stop, 223 N.J. at 418-19, and in

Robinson, the use of a "flash bang" device in connection with a

knock-and-announce warrant, 200 N.J. at 18-22, neither ever

raised to the trial court. Defendants raised the issue of the

accuracy of the WEX fuel records to the trial court here. The

majority holds, however, that defendants' failure to do so until

after partial summary judgment had already been entered

precludes our review of the issue. I disagree.

 As the Court explained in Lombardi v. Masso, 207 N.J. 517,

534 (2011), "[i]t is well established that 'the trial court has

the inherent power to be exercised in its sound discretion, to

review, revise, reconsider and modify its interlocutory orders

at any time prior to the entry of final judgment'" (quoting

Johnson v. Cyklop Strapping Corp., 220 N.J. Super. 250, 257

(App. Div. 1987), certif. denied, 110 N.J. 196 (1988) (emphasis

added)). Rule 4:42-2, which governs reconsideration of

interlocutory orders, see R. 1:7-4(b), provides that "any order

 5 A-0703-15T2
. . . which adjudicates fewer than all the claims as to all the

parties shall not terminate the action as to any of the claims,

and it shall be subject to revision at any time before the entry

of final judgment in the sound discretion of the court in the

interest of justice."

 Although defendants' failure to have timely realized that

plaintiffs' calculation of fuel taxes for those drivers using

WEX cards overstated the damages by including purchases of

gasoline as well as diesel fuel is certainly not laudatory, it

is not an incomprehensible error. Discovery was still ongoing,

the records belonged to a third party, and class counsel

represented in its statement of undisputed material facts that

those records were confined to diesel fuel purchases, a

statement defendants allege they only subsequently discovered

was demonstrably false.1

 On appeal, defendants have submitted a supplemental

appendix, using the same WEX card records submitted by

plaintiffs on the motion, along with additional records obtained

from Wright Express that break down the fuel purchases between

diesel fuel and gasoline. Defendants claim a comparison of the

1
 Defendants nowhere suggest the error was anything other than
inadvertent.

 6 A-0703-15T2
documents demonstrates plaintiffs overstated their damages by

more than $20,000 by including purchases of gasoline.

 Plaintiffs make no response to any of defendants'

particularized claims. Instead, they contend only that they

based their calculation of "the amount of the fuel tax each

Class member paid" on "the information WEX provided," and that

the court should not consider the argument that they improperly

included the fuel taxes on gasoline purchased for the class

members' personal use because defendants never raised that

particular argument when they were arguing the need to prove

exact damages in the trial court. Pointedly, they do not

represent on appeal that their damage calculation was limited to

the fuel tax charges on purchases of diesel fuel.

 Because defendants raised the issue of plaintiffs' need to

establish actual, "exact" damages on their fuel tax claims under

the TIL regulations when successfully defending against summary

judgment on damages for the non-WEX fuel purchases, and then

moved for reconsideration of a prior order on damages on the

same grounds, that issue was properly preserved for appellate

review, notwithstanding that defendants failed to make the

argument on the initial motion on the WEX card purchases. See

Docteroff v. Barra Corp. of Am., Inc., 282 N.J. Super. 230, 237

(App. Div. 1995) ("[W]e need not get caught up in the question

 7 A-0703-15T2
concerning the extent to which plaintiffs have shifted gears or

changed their position regarding the appropriate statute of

limitations. Because the issues before the trial judge dealt

with whether the suit was timely and what the controlling

limitations period was, we will consider the same issues as

presented to us, regardless of whether plaintiffs' principal

theory has changed."). We may thus consider whether the proofs

plaintiffs presented on the motion for partial summary judgment

for fuel taxes owed the WEX card users was sufficient to

establish their damages. See Lombardi, supra, 207 N.J. at 542.

 Given plaintiffs' acknowledgment that WEX card users could

and did use their cards for personal gasoline purchases and what

could be termed, at best, an ambiguity as to whether the WEX

records on which plaintiffs based their damages were limited to

diesel fuel purchases or included gasoline purchases for which

no fuel taxes were due, I would vacate the order for partial

summary judgment and remand for a proper calculation of damages.

See Ziegelheim v. Apollo, 128 N.J. 250, 264 (1992) ("Summary

judgment should not be granted when the moving party

demonstrates through its own submissions that there is a genuine

dispute over material fact, regardless of the presence or

absence of submissions by the opposing party.").

 8 A-0703-15T2
 The "special power afforded to judges over their

interlocutory orders derives from the fact that cases continue

to develop after orders have been entered." Lombardi, supra,

207 N.J. at 536. That was clearly the case here, where the

court entered a whole series of partial summary judgments on

discrete issues over the course of discovery. Although

defendants did not raise the error in plaintiffs' calculation of

the fuel tax damages for WEX users until well after partial

summary judgment had been entered on the claim, and never did so

in as clear a fashion as they have on appeal, they plainly

challenged the accuracy of the fuel tax calculations for all

fuel purchases, whether paid for in cash or with a WEX card,

before trial and entry of final judgment. Accordingly, I think

we are obliged to consider the issue on the merits.

 Affirming the judgment without substantive review in these

admittedly unusual circumstances raises the unpalatable specter

of permitting a likely erroneous damage calculation to stand

because defendants failed to catch the error before entry of an

interlocutory order for partial summary judgment. Because I

think that result inconsistent with the nature of the order and

unjust on the facts presented, I respectfully dissent.

 9 A-0703-15T2