**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0682-18T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

NESTOR BALBI, a/k/a NESTOR
BALBI-CIRIACO,

    Defendant-Appellant.

_____

Argued telephonically April 29, 2020 –
Decided June 2, 2020

Before Judges Fuentes, Haas and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 17-06-0767.

Susan Lee Romeo, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Susan Lee Romeo, of counsel and on the briefs).

Craig Allen Becker, Assistant Prosecutor, argued the cause for respondent (Mark Musella, Bergen County Prosecutor, attorney; Craig Allen Becker, of counsel and on the brief).

PER CURIAM

Defendant Nestor Balbi appeals from the July 16, 2018 denial of his suppression motion and challenges his September 21, 2018 sentence, based on the State's refusal to offer him a Graves Act[1] waiver without a corresponding statement of reasons. We remand for additional findings as to defendant's suppression motion and direct that defendant be resentenced in the event the outcome of defendant's suppression motion remains unchanged following the remand.

We glean the following facts from the record. On June 19, 2017, a Bergen County grand jury returned Indictment No. 17-06-0767, charging defendant with second-degree possession of cocaine with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(2) (count one); third-degree possession of cocaine, N.J.S.A. 2C:35-10(a)(1) (count two); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1) (count three); second-degree possession of a handgun while attempting to commit a drug-related crime,

---

[1] Pursuant to the Graves Act, N.J.S.A. 2C:43-6(c), any person convicted of the unlawful possession of a firearm, N.J.S.A. 2C:39-5(b), "shall be sentenced to a term of imprisonment." The Graves Act further requires that for certain offenses,"[t]he term of imprisonment shall include the imposition of a minimum term . . . . [which] shall be fixed at one-half of the sentence imposed by the court or [forty-two] months, whichever is greater . . . during which the defendant shall be ineligible for parole." N.J.S.A. 2C:43-6(c).

N.J.S.A. 2C:39-4.1 (count four); fourth-degree possession of hollow-nose bullets, N.J.S.A. 2C:39-3(f) (count five); and fourth-degree possession of a defaced firearm, N.J.S.A. 2c:39-3(d) (count six).

Defendant moved to suppress evidence from a motor vehicle stop that led to his indictment. In his motion, he argued there was no reasonable, articulable suspicion to justify the initial stop, that the judge who issued a search warrant after the stop failed to exercise his independent judgment before approving it, and the affidavit supporting the search warrant contained statements that were willfully false or in reckless disregard for the truth. The motion judge granted a testimonial hearing regarding the lawfulness of the stop, as well as a Franks[2] hearing regarding the validity of the search warrant.

Officer Timothy Cullen, a veteran police officer with fifteen years of experience, was the only witness to testify at the court-ordered hearings. He affirmed that on February 17, 2017, while assigned to the Bergen County Prosecutor's Office Narcotics Task Force, he received an alert from an agency

---

[2] Franks v. Delaware, 438 U.S. 154 (1978). When a defendant challenges the veracity of a search warrant affidavit and demands a Franks hearing, that defendant must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." State v. Robinson, 200 N.J. 1, 7 (2009) (citation omitted).

A-0682-18T3

within the New York Police Department that a Subaru Tribeca bearing a particular Pennsylvania license plate had crossed the George Washington Bridge southbound from New York into New Jersey at approximately 2:38 a.m. The vehicle was registered to Norma Ivette Diaz Natal. Officer Cullen recalled being involved in two prior narcotics cases involving Natal in which cars registered to her contained hidden trap compartments, and in one instance, a kilo of cocaine. He suspected the Subaru might contain a hidden compartment and set up surveillance with fellow officers near the George Washington Bridge to await the Subaru's return to New York City that day.

At approximately 7:00 p.m., a fellow officer spotted the Subaru and noted that its front and rear windows were tinted. Knowing front windows of cars driven in New Jersey cannot be tinted unless the driver has a specific skin condition or ailment, N.J.S.A. 39:4-58; N.J.A.C. 13:20-33.7(d), the officer stopped the Subaru.

When Officer Cullen joined his fellow officer on scene, he approached the car. He noted that "the windows [on the Subaru] were being lowered, and [he] could see it was occupied by five males." Officer Cullen detected the strong smell of cologne coming from the passenger compartment. Defendant was seated in the driver's seat and asked to produce his driver's license, registration

4

and insurance card. While defendant gathered this information, Officer Cullen noticed an air freshener, a single key ignition, and an aftermarket alarm fob inside the vehicle. Based on his experience, Officer Cullen testified that all of these seemingly innocuous items are affiliated with drug trafficking. As defendant reached across his passenger to hand the officer his documents, Officer Cullen saw defendant's "hand was shaking considerably." Defendant's documents showed he lived in an area of the Bronx which the officer knew to be a "well-documented high drug trafficking hub."

Defendant first told Officer Cullen the Subaru belonged to him, but then stated it belonged to his girlfriend's sister. He then advised the car belonged to his girlfriend's mother. Defendant also provided inaccurate or incomplete information about where the car was registered and the address where he picked up his passengers. Further, he and his passengers provided inconsistent answers about their activities before the stop.

Cullen asked defendant to step out of the vehicle. After he refused Officer Cullen's request to a consensual search of the vehicle, the officer called for a canine unit. The canine performed a free-air sniff of the vehicle and its handler advised Officer Cullen that the canine alerted to the presence of narcotics on the

front passenger side door of the vehicle. Defendant and his co-defendants were arrested, and the Subaru was impounded.

On February 18, 2017, the police obtained a search warrant for the Subaru based on Officer Cullen's affidavit. His affidavit included his observations from the motor vehicle stop and the fact that the Subaru was registered to a third party not present at the stop. When the search warrant was executed, the police discovered a handgun and a clear plastic bag containing a white powdery substance in a hidden compartment. Testing confirmed the substance was cocaine.

During defendant's suppression hearing, the State played a motor vehicle recording (MVR) of the stop. It was admitted into evidence without objection. When Officer Cullen's testimony concluded, defense counsel, including defendant's attorney provided closing arguments, as did the State. Upon completion of the State's closing argument, defendant's attorney inquired of the motion judge, "may I just say one more thing?" Defendant's counsel then referred to the MVR footage of the canine sniff and stated:

> With regard to the dog hit that . . . you may not have noticed, but it is on the dashcam the officer opened the door of the car, the front driver's side and right passenger side, front right passenger. A dog hit doesn't require . . . a search warrant because it's considered non-invasive. But here, they opened the door. They let

6

the dog in to sniff . . . . So, for that reason, I argue they should have had . . . a search warrant for the dog[].

The assistant prosecutor disagreed, remarking:

I don't remember them doing that, Judge. It's on the film. He walked the dog around the car and the dog scratched on the opposite side and I didn't see the door open there.

. . . .

You'll have the film of the dog already hit on the car. The dog hit on the car.

The motion judge directed counsel to replay the segment of the MVR pertaining to the canine sniff. As it played, counsel took turns narrating what each observed in the footage. The motion judge also commented, "I saw it. They opened up . . . the driver door." The assistant prosecutor added that the windows in the Subaru were down during the canine sniff, to which defendant's attorney remarked, "I don't believe we've . . . heard testimony about that." No further testimony was elicited after this exchange.

On July 16, 2018, the motion judge issued an extensive written opinion, denying defendant's suppression motion and upholding the validity of the search warrant. The motion judge found the motor vehicle stop was justified as the police saw the Subaru's front and rear windows were tinted and cited defendant for the motor vehicle violation. The judge also found the police lawfully

7

prolonged the stop. He credited Officer Cullen's testimony, acknowledging that after the stop, the officer detected a heavy odor of cologne, a single key ignition, and an aftermarket fob associated with hidden compartments. The judge also noted defendant and his passengers provided conflicting information to law enforcement and defendant was unable to accurately identify the Subaru's owner or its place of registration. Additionally, the judge accepted the officer's testimony that defendant was nervous and denied he had "ever been in trouble," even though he was involved in a prior criminal case with a federal agency and arrested for conspiracy to commit robbery. "Based on the totality of the circumstances," the judge concluded "the request for a [canine] officer to search the car was reasonable . . . . [and] there was no indication that the stop was longer than necessary to search for potential contraband. When [the canine] alerted the officers to narcotics in the vehicle, the officers reasonably impounded the vehicle and requested a search warrant."

Turning to the issue of whether the search warrant was supported by probable cause, the motion judge found the search warrant affidavit "sufficiently set forth the reasons for the stop and there were no material misstatements made with reckless disregard of the truth." Accordingly, he determined there was "ample evidence to support a probable cause finding to issue the search warrant."

A-0682-18T3

Noting Officer Cullen's prior involvement with corresponding narcotics investigations, the judge again reviewed the factors which led to the issuance of the warrant, including:

> a single key ignition with an aftermarket alarm fob, a heavy odor of cologne [which] emanated from the passenger compartment, and [the canine] alerted the officers to [the] presence of narcotics in the vehicle. These facts along with the rest of [Officer] Cullen's warrant application reasonably provided the neutral judge with probable cause to issue the search warrant.

Following the denial of his suppression motion and Franks application, defendant attempted to negotiate a plea deal through counsel. In a July 23, 2018 letter, defendant's attorney stated that "Mr. Balbi respectfully requests that, in return [for pleading guilty to counts one and three of the indictment], the State move for a waiver pursuant to N.J.S.A. 2C:43-6.2 to reduce the parole ineligibility period to one year." She remarked that such a resolution would be "in keeping with what other first-time offenders facing second[-]degree cases have received." Approximately one week later, the assistant prosecutor responded with a two-line email which read, "[p]lease give me a call to discuss your July 23, 2018 letter re: defendant Balbi's plea. Thank you." The record is devoid of any further discussions related to the Graves Act. Defendant was sentenced on September 21, 2018 to a five-year prison term on count one, to run

9

concurrent to a term of five years with a forty-two-month parole disqualifier on count three.

On appeal, defendant raises the following arguments:

POINT I

> THE DENIAL OF DEFENDANT'S SUPPRESSION MOTION MUST BE REVERSED, AND THE EVIDENCE SUPPRESSED, BECAUSE THE POLICE CONDUCTED AN UNCONSTITUTIONAL SEARCH WITHOUT A WARRANT WHEN THEY OPENED THE CAR DOORS AS PART OF THE "FREE AIR" DOG SNIFF.

POINT II

> DEFENDANT'S SENTENCE MUST BE REVERSED AND REMANDED BECAUSE, CONTRARY TO THE REQUIREMENTS OF STATE V. BENJAMIN, 228 N.J. 358 (2017), AND THE ATTORNEY GENERAL'S DIRECTIVE, THE PROSECUTOR PROVIDED NO STATEMENT OF REASONS FOR REFUSING DEFENDANT'S REQUEST FOR A WAIVER UNDER N.J.S.A. 2C:43-6.2 OF THE MANDATORY MINIMUM SENTENCE FOR A GRAVES ACT OFFENSE.

Initially, defendant urges us to reverse the suppression ruling, claiming the canine sniff unlawfully extended beyond the exterior of the Subaru. He maintains the dog's handler opened the driver's door, as well as the front passenger door. The State disagrees that reversal is necessary, arguing the opening of a car door during the canine sniff "was not the direct or indirect cause

10

of the later discovery of evidence." The State also contends the driver-side front door window "was rolled down for the entirety of the stop," that other "windows appear to be rolled down and there is no indication that the dog or the officer ever entered the vehicle." Additionally, the State argues that the challenged evidence would be admissible under the doctrines of "inevitable discovery" or "independent source" and that "even without the hit from the dog sniff, the remaining details present in the warrant are sufficient to maintain probable cause to search the vehicle."

It is well established that "a search based on a properly obtained warrant is presumed valid." Robinson, 200 N.J. at 7-8 (quoting State v. Valencia, 93 N.J. 126, 133 (1983)). A defendant challenging the validity of a search warrant has the burden to prove there was no probable cause supporting the issuance of the warrant or that the search was otherwise unreasonable. Ibid. "When reviewing the issuance of a search warrant by another judge, the court is required to pay substantial deference to the judge's determination" of probable cause. State v. Dispoto, 383 N.J. Super. 205, 216 (App. Div. 2006). Any doubts as to the validity of the search warrant "should ordinarily be resolved by sustaining the search." State v. Keyes, 184 N.J 541, 554 (2005) (citations omitted).

Additionally, it is well established that appellate courts "reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are 'supported by sufficient credible evidence in the record.'" State v. Elders, 192 N.J. 224, 243 (2007) (internal citations omitted). This is especially important for those findings by the trial court "which are substantially influenced by his [or her] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Johnson, 42 N.J. 146, 161 (1964). "A trial court's findings should be disturbed only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'" Elders, 192 N.J. at 244 (quoting Johnson, 42 N.J. at 162). "Video-recorded evidence is reviewed under the same standard." State v. Hagans, 233 N.J. 30 (2018). But a court's legal conclusions are reviewed de novo and not entitled to deference by an appellate court. State v. Handy, 206 N.J. 39, 45 (2011).

The Fourth Amendment of the Federal Constitution and Article I, Paragraph 7 of the New Jersey Constitution guarantee individuals the right to be free from unreasonable searches and seizures. U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7. A dog sniff of the exterior of a vehicle is not considered a search and is much less intrusive than a typical search. City of Indianapolis v.

12

Edmond, 531 U.S. 32, 40 (2000); State v. Dunbar, 229 N.J. 521, 534 (2017). Privacy rights are not implicated in exterior dog sniffs because narcotics detection dogs do not "expose noncontraband items that otherwise would remain hidden from public view." Illinois v. Caballes, 543 U.S. 405, 409 (2005).

A canine sniff of a vehicle "does not require entry into the car and is not designed to disclose any information other than the presence or absence of narcotics." Edmond, 531 U.S. at 40. Accordingly, "an officer does not need reasonable suspicion independent from the justification for a traffic stop in order to conduct a canine sniff." Dunbar, 229 N.J. at 540.

Here, we are faced with a dearth of information about the factual circumstances surrounding the canine sniff. For example, it is unclear if the canine indicated the presence of drugs prior to, and after, the alleged warrantless intrusion of the vehicle. It also is not known if the dog would have ultimately reacted positively to the presence of narcotics on the vehicle without the purported intrusion. See United States v. Lyons, 486 F.3d 367, 373 (8th Cir. 2007).

If a dog opens a door or jumps through a window without prompting by its handler during a canine sniff, at least one court has concluded the search is not unlawful. See United States v. Pierce, 622 F.3d 209, 213-15 (3d Cir. 2010).

13

In Pierce, the canine jumped through an open car window and sniffed throughout the entire interior of the car. Id. at 211-12. The Third Circuit held that because the dog entered the car without prompting and was following its "natural instincts," this was not a search. Id. at 213-15. Additionally, at least one federal circuit court has held if a dog's access to a car's interior is facilitated by the conduct of the driver or passenger of the car, the search is not unlawful. United States v. Pulido-Ayala, 892 F.3d 315, 319-20 (8th Cir. 2018).

Certainly, there is unrefuted testimony from Officer Cullen that windows were lowered as he approached the Subaru. But no testimony was elicited from this officer about whether the dog alerted to the front driver or passenger doors before either was allegedly opened and whether any doors or windows were opened during the "free air" sniff. Perhaps the canine handler could have shed some light on what transpired, but he was not subpoenaed by the defense or called by the State. Any attempts by counsel to try and fill the void by representing what appeared in the MVR footage cannot substitute for such competent evidence. As the motion judge mentioned the results of the canine sniff when denying the suppression motion and upholding the validity of the search warrant, we are constrained to remand this matter to afford him the opportunity to make additional factual findings and legal conclusions. On

14

remand, the judge is in the best position to make specific factual findings about the dog's movements and thereafter address whether the canine sniff was lawful and what effect, if any, an illegal breach of the vehicle's exterior had on the search and the validity of the search warrant.

Regarding defendant's Point II, we note his guilty plea to the second-degree offense of unlawful possession of a handgun without a permit subjected him to the mandates of the Graves Act.  Accordingly, under N.J.S.A. 2C:43-6(c), the sentencing court was compelled to impose a parole ineligibility period that equaled either one-half of the sentence or forty-two months, whichever was greater, unless defendant received a Graves Act waiver.

A Graves Act waiver mitigates the "undue severity that might accompany the otherwise automatic application of the mandatory minimum sentence under the Graves Act, [as provided under N.J.S.A. 2C:43-6.2]," State v. Benjamin, 228 N.J. 358, 368 (2017), and provides the following limited exception for certain first-time offenders:

> On a motion by the prosecutor made to the assignment judge that the imposition of a mandatory minimum term of imprisonment under [the Graves Act] for a defendant who has not previously been convicted of [a Graves Act] offense . . . does not serve the interests of justice, the assignment judge shall place the defendant on probation pursuant to [N.J.S.A. 2C:43-2(b)(2)] or reduce to one year the mandatory minimum

term of imprisonment during which the defendant will be ineligible for parole. The sentencing court may also refer a case of a defendant who has not previously been convicted of an offense under that subsection to the assignment judge, with the approval of the prosecutor, if the sentencing court believes that the interests of justice would not be served by the imposition of a mandatory minimum term.

[N.J.S.A. 2C:43-6.2.]

Under either scenario set forth in N.J.S.A. 2C:43-6.2, the prosecutor must affirmatively indicate the approval or denial of the waiver for any defendant wishing to take advantage of it. Ibid. To ensure uniformity in the application of this provision, the New Jersey Attorney General issued the Directive to Ensure Uniform Enforcement of the "Graves Act" (Oct. 23, 2008, as corrected Nov. 25, 2008) ("Directive"). In addition to describing the procedure to be followed when addressing a waiver request, the Directive includes specific record-keeping requirements. In fact, the Directive requires prosecutors to "document in the case file its analysis of all of the relevant aggravating and mitigating circumstances, whether or not the agency moves for or approves a waiver or reduction pursuant to N.J.S.A. 2C:43-6.2." Directive at 13.

The Benjamin Court concluded sufficient procedural safeguards existed under the Graves Act to protect a defendant's constitutional rights, in part, because of the Attorney General's Directive. 228 N.J. at 372. The Court noted

16

the importance of documenting the prosecutor's analysis of all the circumstances relevant to a Graves Act waiver and determined a statement of reasons from the State about this analysis was "appropriate to facilitate the judicial review for the arbitrary or discriminatory exercise of prosecutorial discretion." Ibid. Central to the Court's decision was its conclusion that "prosecutors are guided by standards, inform defendants of the basis for their decisions, and are subject to judicial oversight." Id. at 373.

Here, the State admits it departed from Benjamin by not providing a statement of reasons to defendant after he requested a Graves Act waiver. But it argues his failure to raise the waiver issue before the sentencing court precludes him from seeking relief. We disagree.

The State provides no explanation for its lack of a concrete and detailed response to defendant's July 2018 request for a Graves Act waiver. We decline to sanction such a denial-by-omission approach. A failure to respond by the prosecutor makes it virtually impossible for a defendant to show a prosecutor's refusal to allow for a Graves Act waiver constituted a "patent and gross abuse of discretion" or for a reviewing court to determine whether a prosecutor's denial of the waiver was based on legally sustainable grounds. State v. Alvarez, 246 N.J. Super. 137, 148 (App. Div. 1991). Accordingly, we remand this matter for

resentencing, pursuant to the Directive, in the event defendant's suppression motion is denied following our remand. We express no opinion on the outcome of the remanded proceedings, the scope of which we leave to the trial court's discretion.

Remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

18                                                                                    A-0682-18T3