**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1865-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DIAAB SIDDIQ, a/k/a
DIAAB M. SIDDIQ,
MARSHALL C. DAVIS,
MARSHALL E. DAVIS,
KERRY A. SPROUSE,
KERRY SPROUSE,
MARSHALL DAVIS, and
DIAAB MAHDI SIDDIQ,

    Defendant-Appellant.

_____

Argued December 10, 2024 – Decided January 17, 2025

Before Judges Chase and Vanek.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 19-04-0991.

Zachary G. Markarian, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Zachary G. Markarian, of counsel and on the brief).

Marisa D. Pescatore, Assistant Prosecutor, argued the cause for respondent (William E. Reynolds, Atlantic County Prosecutor, attorney; Marisa D. Pescatore, of counsel and on the brief).

PER CURIAM

Following denial of his motion to suppress, defendant Diaab Siddiq pled guilty to money laundering, N.J.S.A. 2C:21-25(a); maintaining a narcotics production facility, N.J.S.A. 2C:35-4; possession with the intent to distribute heroin, N.J.S.A. 2C:35-5(b)(2); and certain persons not to possess a firearm, N.J.S.A. 2C:39-7(b)(1). In accordance with the plea agreement, defendant was sentenced to an aggregate term of twelve years in prison with an eight-year period of parole ineligibility pursuant to the Graves Act, N.J.S.A. 2C:43-6. On direct appeal we affirmed in part, but concluded a remand for a new suppression hearing was necessary. Defendant now appeals from the October 19, 2022 order denying the remanded motion to suppress and raises the following issues for our consideration:

> POINT I
>
> THE MOTION COURT'S CONCLUSION THAT POLICE WITNESSES MEETING PRIOR TO THE HEARING TO DISCUSS THE SEARCH THAT TOOK PLACE SIX YEARS EARLIER CREATED A RELIABLE "COLLECTIVE MEMORY" WAS DIRECTLY CONTRARY TO OUR SUPREME

2

COURT'S HOLDINGS ON MEMORY DECAY AND
CONTAMINATION.

POINT II

THE MOTION COURT ERRED BY FINDING IN
THE ALTERNATIVE THAT THE EXCLUSIONARY
RULE WOULD NOT APPLY TO ANY KNOCK-
AND-ANNOUNCE VIOLATION AND THAT
[DEFENDANT] LACKED STANDING.

We reject defendant's arguments and affirm denial of his suppression motion.

I.

The charges stem from the following pertinent facts, gleaned from the record and our consolidated unpublished opinion addressing defendant's appeal. State v. Siddiq, Nos. A-1250-19, A-2436-19 (App. Div. May 5, 2022).

On June 28, 2016, investigators secured a "knock-and-announce" search warrant for defendant's residence in Mays Landing.[1] In an affidavit written by Atlantic City Police Department (ACPD) Detective Darrin Lorady, he outlined the nearly twelve-month state and federal investigation into two criminal street gangs in Atlantic City, where defendant was identified as one of the two main leaders of a vast drug distribution network.

---

[1] Investigators also secured search warrants for other homes and vehicles.

A-1865-22

On the same day, early in the morning, a team of police officers executed the search warrant at the Mays Landing residence and seized two handguns, ammunition, around $40,000 in cash, and a money counter. Defendant challenged the search, arguing, among other things,[2] that the warrant was executed as a no-knock warrant, despite the judge's denial of the request.

At the original suppression hearing, Lorady was the only witness to testify as to the entry of the house. He testified that the search warrant was executed following a "fairly standard procedure":

> We knocked on the door, . . . obviously loud enough so someone could hear. A couple of bangs on the door . . . . Wait approximately ten seconds to see if anyone answers. Another knock, a couple of knocks, . . . wait. Nothing. Then you set the tool. . . . [A]nd then we would be able to make entry. . . . [T]hat's basically what happened there.

Notably, Lorady could not recall whether he announced "police" at the front door, but did testify that he announced the police presence after the door was open and the officer's made entry. On cross-examination, Lorady confirmed that he knocked on the door and waited thirty seconds without any response. Upon entry, Lorady saw an adult woman, later identified as Chaka James, peek

---

[2] Defendant's other allegations concerning the legality of the search warrant were affirmed in our prior opinion.

her head out and retreat into another room.  The officers detained her and conducted their search of the entire home.

Subsequently, the motion judge denied defendant's motion to suppress, finding that "'the detective's credibility'" was "'intact,'" "'internally consistent,'" and "'believable.'"  On direct appeal, we concluded that a remand was necessary to "focus[] on the execution of the search warrant" and determine "whether law enforcement violated the terms of the warrant."  Siddiq, slip op. at 25.  We reasoned that "notably the judge never made a specific finding that Lorady knocked and announced the presence of police prior to opening the door with the pneumatic device."  Id. at 21.

A different motion judge conducted a suppression hearing on two dates in the summer of 2022.  The State called four officers, and defendant called one officer and James, the mother of defendant's child and owner of the Mays Landing home.

First, Lorady testified to his role during the execution of the search warrant.  Lorady testified that his role was to breach the door, if necessary.  He testified that ACPD Officer Howard Mason was with him at the front door.  Lorady recounted that he was responsible for the breach and listening for movement, and Mason was responsible for knocking and announcing.

According to Lorady, the order of duties involved "a knock, announce, . . . listen for movement," which "happens a couple of times," and "a breach if there [was] no answer or [no one] . . . c[ame] to the door." After Lorady breached the door and entered the premises, he testified that James came out of a room and ran back into it, so the officers identified themselves again. Eventually, the officers secured the woman and her child and searched the residence.

When asked about discrepancies between his testimony at the original hearing and his current testimony, Lorady testified that he was "confus[ed] . . . about how . . . [to] answer[] some questions in regards to who actually knocked and announced and whether [he] was testifying on behalf of the team as a whole and/or [his] particular duties . . . ." He recounted that in preparation for his testimony at this hearing, he had met with other members who participated in the execution of the search warrant and through those discussions he was able to recall that Mason was the one who knocked and announced on the door.

Next, Mason testified on behalf of the State. He testified that he had worked for ACPD for twenty-five years, retired, and then came back as a special law enforcement officer. He had been part of the Special Weapons and Tactics team for at least nineteen years and had experience acting as the number one or number two man on the search warrant.

6

At the time of the investigation into defendant, Mason stated he was assigned to the "special investigations section," where he assisted with surveillance and helped execute the search warrant. He testified that his job was to be the number one guy through the door that day.

Mason explained that he knocked, announced "police, search warrant," at a high volume and repeated the process two more times before breaching the door. Mason clarified the importance of clearly announcing their presence as law enforcement to avoid residents misconstruing their presence as a home invasion. At the same time, he was knocking and announcing, he testified Lorady was at the door with him, holding the breech tool. Finally, Mason testified that he had a meeting with the other officers in preparation for the hearing and that he remembered this case specifically because "it was a very long, lengthy investigation," and he "could not forget it."

Next, Lieutenant Daniel Cocoran testified for the State. He had worked at ACPD since 2005, and participated in an investigation involving defendant, and assisted with the search warrant. At the time, he was the highest-ranking member of the ACPD on the scene. Cocoran recounted that he was called at home and it was his role to get ACPD units on-scene to execute the warrant.

A-1865-22

Further, he recalled meeting at the liquor store with members of the Atlantic County Prosecutor's Office (ACPO).

Cocoran testified that if it had been a no-knock warrant, a different procedure would have been conducted, and he would have contacted the SWAT commander. He further explained that "[ACPD] ha[d] a policy that if it[ is] a no-knock search warrant, the SWAT team conducts it," but "[i]f it is a knock-and-announce, it can be conducted by members of the police department." Because of that policy, Cocoran noted that if it was a no-knock search warrant, he would not be involved in the execution. Cocoran described that he assigned different roles to the officers on the team. Cocoran assigned Mason to knock and announce, specifically because he had done numerous entries. Cocoran testified that Mason knew the difference between knock and no-knock warrants, and how long he was supposed to wait. Cocoran then recounted the events that occurred when they arrived at the house, "[w]e pulled up to the house and everybody . . . took their places and then we proceeded to conduct the knock-and-announce." He further stated that Mason knocked on the door and Lorady was manning the rabbit tool. Cocoran further explained that he watched the whole search warrant execution, and testified that he heard Mason knock, announce and then wait. He said that, "Mason did that a couple times at which

point eventually . . . Mike Kelly, . . . with [ACPO] said I think there [ is] someone in there, they[ are] moving around." Cocoran elaborated that he heard Mason because of how loud he was, and that Mason knocked three times because it was after the first time that Kelly had said that there was someone inside. Finally, Cocoran testified to meeting at the prosecutor's office weeks before.

ACPO Lieutenant Justin Furman was the State's next witness and testified that he worked at ACPO for approximately nineteen years. He was placed in the back of the line of investigators and was responsible for making sure the search warrant was executed properly and for "documenting the actual search of the residence." According to Furman, Lorady and Mason were at the front door, and he clearly heard them knocking and announcing their presence, multiple times, stating "police, search warrant." Had it been a no-knock warrant, Furman noted it would have been done by the SWAT team. Further, if it were a SWAT job, he would not write a report. Furman confirmed that he had a pretrial preparation meeting prior to the motion hearing.

Defendant then called James, who testified defendant is the father of her son, and that she owns the Mays Landing residence. On the night of the search warrant execution, James testified that she was asleep in bed with her son in the master bedroom, located in the back far left of the house. At the time, she heard

a noise and woke up because she saw flickering from a motion sensor light. Next, she heard a noise of something crashing into the house and immediately jumped out of the bed to go to her safe to grab a handgun. She claimed that when she got to where the safe was located, the police were in her doorway with their guns drawn. James testified she did not hear them yell police or knock.

Finally, defendant called Detective Joseph Procopio, from the Intelligence Unit at the ACPO, to testify regarding the meeting prior to the motion hearing. He testified that he became involved with defendant's case in 2022, when he was asked to be a witness to the pretrial meeting between the assistant prosecutor and the officers who executed the search warrant. According to Procopio, the meeting was in person with Furman, Cocoran, Meyers, Mason and Lorady were on the phone. Procopio recalled that Mason indicated it was he who knocked and the door was breached by another detective. The other officers present at the meeting also recalled Mason as the one who knocked and announced outside the threshold of the house, and that it was Lorady who actually did the breaching. Procopio testified his role was simply to be present as a scribe.

In an extensive thirty-four-page written decision, the court denied the defendant's motion to suppress. Placing the decision in context, the court noted "[a]t no time was there any testimony in the first suppression hearing or the

second hearing that there was a failure to knock." Rather, the court explained the question centered on whether there was an announcement of police presence, and whether that announcement came before or after the breach of the door.

The court then carefully reviewed the testimony of all the witnesses, finding that the police officers were credible, and James was not. In explaining its credibility findings for the officers, the court noted:

> With detailed testimony of the sequence of events, starting from when the knock-and-announce warrant was issued, to the planning of the warrant's execution at the . . . [l]iquor [s]tore, to the emphasis on stack order strategy (i.e., placing the most experienced SWAT team members at the front of the stack with detectives behind them) the officers' testimony is found to be credible. Most, if not all the officers, testified that a no-knock warrant requires the full SWAT team to be present for execution. Alternatively, a knock and announce warrant only requires a combination of detectives and SWAT members. In this instance, the knock-and-announce warrant did not include a full SWAT team. So, this corroborates the intention to execute a knock-and-announce warrant.

Regarding Lorady, the court noted he "was clearly confused and admitted or demonstrated so during his testimony in 2018 and 2022." The court acknowledged Lorady's conflicting prior testimony where he stated that he was the one to knock and announce, but the judge concluded that Mason had the role instead because each officer "had a unique task to perform." "Lorady had to be

11

positioned at the door frame" to "use the heavy piston tool," leaving Mason to knock and announce. The court explained these factual findings were corroborated by "Corcoran's testimony that he assigned [] Mason" to "knock and announce."

Finally, the motion judge credited Furman's corroborating testimony, as he was with ACPO, "independent from the officers from the [ACPD]," and the "highest-ranking officer present" during the warrant execution. During his direct and cross-examination, the judge observed that Furman was "direct and frank about his recollection," that he "candidly indicated that he did not remember every detail including ancillary facts," but that he "was confident and convincing that he heard Mason knock and announce before crossing the threshold of the doorway . . . ." Moreover, the court reasoned that "[i]f each officer testified robotically with very little variation in their recollection" he "would have been more concerned and concluded it was rehearsed or contrived." To the court the "testimony came across during the hearing as natural, unrehearsed, and as a fair indication of their collective recollection of the execution of the search warrant."

Regarding James' incredible testimony, the motion judge discerned that:

> [She] clearly was [awoken] by something, had sufficient time to go to her safe and get a handgun, then

move to the living room. This corroborates the officers' testimony that they were banging on her door before they entered. Otherwise, James would have been taken by total surprise if the officers executed a no-knock warrant, as she claims. She would not have been able to go to her safe, work the combination, retrieve her weapon, and move to the living room.

## II.

Our review of a trial judge's decision on a motion to suppress is limited. State v. Robinson, 200 N.J. 1, 15 (2009). "When reviewing a trial court's decision to grant or deny a suppression motion, appellate courts '[ordinarily] defer to the factual findings of the trial court so long as those findings are supported by sufficient evidence in the record.'" State v. Smart, 253 N.J. 156, 164 (2023) (alteration in original) (quoting State v. Dunbar, 229 N.J. 521, 538 (2017)). "Those findings warrant particular deference when they are 'substantially influenced by [the trial judge's] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. Rockford, 213 N.J. 424, 440 (2013) (citations omitted) (alteration in original); see also Balducci v. Cige, 240 N.J. 574, 594-95 (2020); State v. McNeil-Thomas, 238 N.J. 256, 271 (2019). Appellate courts "will set aside a trial court's findings of fact only when such findings 'are clearly mistaken.'" Dunbar, 229 N.J. at 538 (quoting State v. Hubbard, 222 N.J. 249,

262 (2015)).  We review de novo the judge's pure determinations of law, State v. Mann, 203 N.J. 328, 337 (2010), as well as the application of legal principles to factual findings, State v. Harris, 181 N.J. 391, 416 (2004).

III.

"The knock-and-announce rule renders unlawful a forcible entry to arrest or search 'where the officer failed first to state [their] authority and purpose for demanding admission.'"  Robinson, 200 N.J. at 13-14 (quoting Miller v. United States, 357 U.S. 301, 308 (1958)).  As we recognized in State v. Caronna, "an unjustified knock-and-announce violation essentially renders the search and seizure warrantless, and therefore it is presumed invalid.  Even if no such presumption of invalidity existed, the exclusionary rule would still apply."  469 N.J. Super. 462, 503 (App. Div. 2021) (citation omitted).  "A necessary corollary to the knock-and-announce rule is that when 'the police announce[] their presence and [are] greeted with silence . . . a reasonable time must elapse between the announcement and the officers' forced entry.'"  Robinson 200 N.J. at 16 (alterations in original) (quoting State v. Johnson, 168 N.J. 608, 621 (2001)).

Generally, "[t]here are common factors to be applied in determining the reasonableness of the delay between knocking and announcing and a forcible

entry," including "a suspect's violent criminal history," "an informant's tip that weapons will be present," "the risks to officers' lives and safety," "the size or layout of defendant's property," "whether persons other than defendant reside there," "whether others involved in the crime are expected to be present," and "the time of day." Id. at 17 (citations omitted). However, in drug cases, a reasonable wait time is generally measured by the amount of time it would take to dispose of drugs, rather than the time it would take a resident to reach the door. Id. at 17-18. In Robinson, our Supreme Court held that a delay of twenty to thirty seconds between knock and announcement and forcible entry was reasonable where the object of the warrant was drugs and there was a potential for the destruction of evidence while entry was delayed. Id. at 18. In Rodriguez, we concluded that in the totality of circumstances, a wait of fifteen to twenty seconds after announcement was reasonable where "the objects of the search were drugs and other evidence related to illegal drug trafficking." State v. Rodriguez, 399 N.J. Super. 192, 200-02 (App. Div. 2008). Here, the testimony credited by the judge established that the police knocked and announced their presence and waited "fifteen seconds or longer" before forcibly entering the residence. The judge concluded that the wait time was reasonable under the circumstances.

We reject defendant's contention that the motion judge erred in denying his suppression motion because the State's witnesses directly contradicted Lorady's 2018 testimony. Here, the court weighed all of the witnesses' testimony and explained why he ultimately concluded that the State's witnesses were credible. The court carefully reviewed the testimony in great detail, discerning that a full SWAT team was not present, "corroborat[ing] the intention to execute a knock-and-announce warrant." Moreover, in accessing the credibility of the witnesses, the judge was able to observe the demeanor and body language of each witness. According to the judge, the testimony was "natural, unrehearsed, and as a fair indication of their collective recollection of the execution of the search warrant." As noted above, it is well established that we "should defer to trial courts' credibility findings that are often influenced by matters such as observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record." State v. Locurto, 157 N.J. 463, 474 (1999). We discern no error here.

Defendant also challenges the court's conclusion that "memory becomes more reliable when witnesses are exposed to one another's memories," arguing that such a conclusion directly contradicts our Court's holding in State v. Henderson, 208 N.J. 208, 247 (2022) (emphasis omitted). Defendant further

cites <u>Henderson's</u> "insights about memory distortion" to challenge the motion judge's conclusion that the State's witnesses were reliable. Such an argument effectively contests an issue rooted in fact finding, not interpretation of law.

The court acknowledged that in <u>Henderson</u>, our Court addressed the "troubling lack of reliability in eyewitness identifications" and cautioned about the dangerousness of creating false memories. However, the court distinguished the present case from <u>Henderson</u>, because <u>Henderson</u> involved eyewitness testimony, while the present case "involved several detectives and officers breaching a door of an alleged drug kingpin, after careful planning." The court emphasized a majority of the scientific evidence discussed in <u>Henderson</u> relates to the visual portion of human memory related to identifying a person and police lineups.[3] Here, rather than identifying a perpetrator, the officers were participants in the event and were testifying as to what their actions were.

After analyzing the credibility of the witnesses, summarizing the knock-and-announce law, and recounting that if police fail to knock and announce then it is an unlawful search, the court addressed defendant's contention that the meeting at the prosecutor's office for trial preparation was equivalent to witness

---

[3] We are also aware of the Court's holding in <u>State v. Washington</u>, 256 N.J. 136 (2024) extending the relevant principles of <u>Henderson</u> regarding impermissibly suggestive identification procedures to trial preparation sessions.

tampering. The court was unpersuaded by defendant's attack of the witness reliability, noting that "[the assistant prosecutor] made sure a detective was present to act as a scribe for the meeting," which was held for the "purpose of . . . refresh[ing] and recollect[ing] the events involving the search warrant that took place six years earlier." The court assessed each witness's credibility individually based on their testimony's "rationality, internal consistency, and manner in which it 'hangs together' with other evidence." Since the court's factual findings are grounded in sufficient credible evidence in the record, we see no reason to disturb the court's determination that the record established the officers knocked and announced their presence several times before breaching and entering the residence.

To the extent we have not specifically addressed any remaining arguments, it is because we find them to be without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1865-22